DUKE POWER CO. et al. v. GREENWOOD COUNTY, S. C., et al.

No. 451.

District Court, W. D. South Carolina.

April 23, 1935.

W. S. O'B. Robinson and J. H. Marion, both of Charlotte, N. C., W. R. Perkins, of New York City, and H. J. Haynsworth, of Greenville, S. C., for plaintiffs.

Robinson & Robinson, of Columbia, S. C., and W. H. Nicholson and R. F. Davis, both of Greenwood, S. C., for defendant Greenwood County and its Finance Board.

Henry T. Hunt, of Washington, D. C., for defendant Harold L. Ickes, Federal Emergency Administrator of Public Works.

## I. Outline of Proceeding.

WATKINS, District Judge.

This matter comes before the court upon motions on behalf of all the defendants to dismiss the original bill, as modified and amended by plaintiffs' supplemental bill. The separate motion of Harold L. Ickes, as Federal Emergency Administrator of Public Works, is based upon the ground that the bill, as amended, "does not state any matter of equity entitling the plaintiffs to the relief prayed for, nor are the facts as stated sufficient to entitle the plaintiffs to any relief against the defendants." The motion filed on behalf of all other defendants is based upon three grounds:

"1. Because it appears in the bill of complaint as amended and supplemented that a proceeding entitled R. H. Park, in his own right and as a citizen and taxpayer of Greenwood county, and in behalf of other persons similarly situated v. Greenwood county et al., has heretofore been instituted in the original jurisdiction of the South Carolina Supreme Court, and has been decided against the taxpayer in that action; therefore the questions attempted to be raised by the plaintiffs in this action are res adjudicata.

"2. In that the complaint as amended and supplemented shows upon its face that there is an insufficiency of fact to constitute a valid cause of action in equity against these defendants.

"3. In that the complaint as amended and supplemented shows upon its face that the plaintiffs have no standing in court to question the action of the defendants in the particulars set out in the bill and in the supplemental bill."

The last-mentioned motion was filed February 23, 1935; that of Mr. Ickes, as Federal Emergency Administrator of Public Works, on April 9, 1935. The final brief of counsel upon these motions reached me on April 9, 1935. The purpose set out in the bill is to enjoin the defendants from doing certain acts complained of as illegal and unconstitutional, all of which will fully appear by reference to the pleadings, and will be more specifically detailed later on in this opinion. The Federal Emergency Administrator of Public Works was not made a party to the original bill, but upon his petition, concurred in by the other defendants, an order was passed allowing him to intervene and requiring that he be made a party defendant. Thereupon, the defendants submitted a motion to require the plaintiffs to amend the complaint by setting out the contract finally executed by and between the defendants, in lieu of the contract alleged in the complaint. This motion was refused, for the reason that the plaintiffs had used every effort to ascertain the terms of the contract, which had not then been signed, and, being advised by the defendants, who readily furnished the information, of what was then proposed, set out in the bill as an exhibit thereto the terms of the then proposed contract. Subsequently, the defendants made certain changes in the proposed contract, and advised the plaintiffs thereof, notwithstanding which the actual signing of the contract had not taken place, nor had the plaintiffs been advised of the changes proposed when the bill was filed, nor up to the time that the motion was filed. The defendants then answered, setting up the contract, which had been duly signed at the time of the filing of the answers, and filed motions to dismiss on the same substantial grounds as here presented. Following what the court conceived to be the proper practice, as indicated by the Supreme Court in Borden's Farm Products Co. v. Baldwin, 293 U. S. 194, 55 S. Ct. 187, 79 L. Ed. ——, the court refused the motions to dismiss. Thereafter, the plaintiffs were permitted to file their amended and supplemental bill, and after all the answers were in, the motions to dismiss, above outlined, were filed, and, at the arguments thereon, it was agreed that the court should proceed with the hearing and render its decree based upon the truth of the facts alleged in the bill, which, for the purposes of the motions to dismiss, must be admitted. It was expressly understood, however, that the contract between the defendants, as finally signed, must be accepted as the true contract, in lieu of that originally alleged in the bill. In passing, it should be stated that it appeared to be first contemplated that certain testimony would be taken, but, as stated above, it was finally decided by both sides that this would be dispensed with.

## II. Findings of Fact.

By way of preface to these findings, the court thinks it proper to state that, upon the determinative issues involved, as it views the case, there are but few, if any substantial, issues of fact disclosed by the pleadings, and counsel for both sides have shown a commendable spirit of co-operation in their agreement by which the case may be brought to an early conclusion. Since the motions under consideration admit the truth of all the allegations of fact contained in the bill, and are, of course, part of the record, and since it would too greatly prolong this opinion here to quote them in full, I think it only necessary here to find that the allegations of fact, as contradistinguished from conclusions of law, set out in the bill are true. To clarify the opinion, however, and for the convenience of the appellate courts which may subsequently be called upon to review this opinion, I will briefly summarize certain of the findings upon which my conclusions must and do rest, as follows:

1. The plaintiffs are electrical public utilities corporations, engaged in the intrastate sale and distribution of electric power and energy within the state of South Carolina. Their business and their rates for such sales are subject to the exclusive jurisdiction, regulation, and control of the Railroad Commission of said state. They have invested many millions of dollars in electric power facilities for the purpose of serving the territory in which the defendant Greenwood county intends, through its proposed Buzzard Roost Project, to engage in the generation, distribution, and sale of electric power in competition with the plaintiffs. The plaintiffs are adequately serving this territory and their established and available facilities are amply sufficient so to serve said territory for many years; their rates are just and reasonable and have been duly approved by said Railroad Commission; and they have heretofore secured and now own and use, for the purpose of conducting their business in said territory, valuable franchises and operating rights. Attention will be hereafter called to the provisions of

the South Carolina statutes, imposing upon the plaintiffs numerous obligations, such as continued maintenance of service, enlargement of facilities, taxation, adherence to rates fixed by the Commission, and other duties, to many of which burdens the law does not subject Greenwood county. The bill of complaint adequately alleges the property rights of the plaintiffs, for the protection of which injunctive relief is sought in this suit.

2. The Federal Emergency Administrator of Public Works has entered into an agreement with his codefendants, dated December 8, 1934, for the construction, on the Saluda river, in the state of South Carolina, at a point known as Buzzard Roost, of a hydroelectric plant, together with transmission and distribution lines extending into and through the counties of Greenwood, Newberry, and Laurens, for the purpose of engaging in the business of furnishing electrical energy to municipalities, industrial enterprises, private individuals, and the public generally, for domestic, commercial, and industrial uses. The principal customers with whom the county has entered into contracts, and with whom it proposes to enter into contracts, for the sale of electrical energy to be produced by said plant, are now, and for a number of years have been, customers of the plaintiffs.

3. It is proposed to construct the plant under the supervision and direction of the Administrator, under an agreement by which he purports to be acting under title 2 of the National Industrial Recovery Act [40 USCA § 401 et seq.]. The contract provides for a loan and grant by the Administrator to his codefendant county in an aggregate sum not to exceed $2,852,000. The grant will amount to 30 per centum of the cost of the labor and materials employed upon said project, and the loan will be represented by bonds to be issued by the county to the United States of America; both principal and interest of said bonds to be payable only out of the revenues of the plant. The contract specifically provides that the principal and interest on the bonds, and the maintenance and operation of the hydroelectric system, shall be paid solely and exclusively from the operation of said system, and that the cost of constructing and completing the system shall be paid exclusively from the proceeds of the bonds and the grant described in the contract.

4. It appears from the bill that the county has estimated, through its engineers, that the cost of the completion of the project will come within the limits of the amount to be furnished through the loan and grant, and that the county has set rates for the sale of power based upon these estimates, but that the project will actually cost an excess of more than $1,000,000 beyond the county's estimate; that the project will not be self-liquidating and self-supporting; and that, therefore, the rates fixed by the county in the contract with the Administrator will not meet the requirements of the state statutes under which it is proposed to construct and operate the plant.

5. The proposed rates of the defendants are substantially below the rates of the plaintiffs for serving the same territory, which rates of the plaintiffs have been approved by the Railroad Commission of the State of South Carolina, and it is on account of these lower rates that the defendants have been able to make contracts for the sale of the power which would be produced by said Buzzard Roost Project with those who heretofore, and for a number of years, have been customers of the plaintiffs. If said project should be constructed by the defendants and put into operation, the plaintiffs, because of said lower rates, will be deprived of their customers in the territory in which said project would operate, and the business and property of the plaintiffs would be seriously and permanently injured.

6. The declared policy of the Federal Emergency Administrator of Public Works, as set out in Release No. 989, issued in August, 1934, a copy of which is attached to and made part of the amended bill of complaint, is that, in making appropriations of federal funds to municipally owned power projects, such as the Buzzard Roost, the enterprise so aided shall sell power at rates substantially below the rates of any privately owned electrical utility with which the municipally owned project will compete, thereby, in effect, constituting the rates of the municipally owned project a yardstick to regulate and bring about a reduction of the rates of the privately owned utility.

7. The rates for the sale of power to be produced by said Buzzard Roost Project were fixed by Greenwood county, subject to the approval of the Administrator, under the terms of the loan and grant agreement entered into December 8, 1934, providing that, as a condition of the loan and grant, the county should "adopt a reso-

lution satisfactory in form and substance to the Administrator providing for rates to be charged for services afforded by the hydro-electric system."

8. The Buzzard Roost project is a purely intrastate enterprise. The county does not propose, nor is it empowered, to engage in an interstate business.

9. It is proposed by the defendants to construct the enterprise in question solely through funds furnished by the Federal Emergency Administrator of Public Works, and the facts alleged indicate conclusively to the mind of the court that it is not in contemplation of development through any other source. The possibility of such method of financing, if such possibility exists (which appears extremely doubtful), is not here under consideration. We are to deal with the case presented and with that case alone.

10. It is shown by its application filed with the Federal Power Commission that the purpose of the county is to conduct a proprietary business by which it is proposed to sell by far the greater portion of its output to business enterprises generally outside of the county of Greenwood, and to furnish the smaller fraction thereof to customers in Greenwood county, the greater portion of which fraction it has contracted to sell, or proposes to enter into contracts to sell, to textile corporations. Counsel for the county in argument conceded that the largest of such contracts referred to in its application to the said Power Commission has already been abandoned. I, therefore, find that the county's proposed enterprise is not primarily for the purpose of establishing a utility to supply the needs of the county, but that it is proposed to do a general proprietary utilities business, both within and without the county, in competition with the plaintiffs.

11. By way of preface to the statement of my conclusions of law, attention is here directed to certain applicable provisions of South Carolina statutes. Among the duties imposed upon the plaintiffs by Act No. 871, approved April 8, 1932 [37 St. at Large S. C. p. 1497], and amendments thereto, are the following: The rates shall be just and reasonable and approved by the Railroad Commission; adequate, efficient, and reasonable service must be furnished; no rate greater or less than that prescribed by the schedules so adopted shall be received or accepted; no unrea-sonable preference or advantage in rates or services shall be extended to any person, corporation, or municipality; the rates are at all times subject to modification, change, or annulment by the Commission as the public interest may require; the Commission may require the plaintiffs to establish, construct, maintain, and operate any reasonable extensions of their existing facilities; the plaintiffs may not, without permission of the Commission, abandon all or any portion of their service to the public, except for nonpayment of undisputed charges; every requirement, decision, rule, or regulation of the Commission must be complied with. In Act No. 902, approved April 12, 1934 [38 St. at Large S. C. p. 1543], it is provided that all provisions of that act, and all prior acts, repugnant to or inconsistent with the provisions of the Public Works Administration Act of the Congress of the United States, are declared void in so far as the same are in conflict with said act of Congress, it being declared to be the intention of Act No. 902 to enable counties, etc., to qualify for securing the loan from the Public Works Administration of the Federal Government. By Act No. 1095, approved April 12, 1934 [38 St. at Large S. C. p. 2020], Greenwood county, through its finance board, is authorized to procure a loan from the Public Works Administration for the purpose of constructing the plant in question, and, as a self-liquidating project, to issue bonds to secure the same.

12. If, and in so far as, it may be necessary for the purposes of this opinion to consider other facts established by the bill, they will be appropriately hereinafter referred to.

### III. Conclusions of Law.

■ 1. *Plea of Res Adjudicata.*—The bill sets out in detail the proceedings brought in the original jurisdiction of the Supreme Court of South Carolina for the purpose of testing the constitutionality of the right of the county to procure the loan in question, and to establish with the proceeds thereof the proposed Buzzard Roost Plant. That was an application for an injunction upon the part of Dr. R. H. Park, in his own right as a citizen and taxpayer of Greenwood county, and in behalf of other persons similarly situated. The county itself, its county supervisor, its county treasurer, and another of its citizens, constituting its finance board, were made parties defendant. After the pleadings were filed,

the Duke Power Company and the Southern Public Utilities Company, alleging their status as large property holders and taxpayers, and as holders of valuable franchises, filed a petition to be allowed to interplead. To this petition, all parties to the cause, plaintiffs and defendants, objected, and the petition was denied by the Supreme Court, which, however, gave permission to petitioners to participate in the argument of the case as presented by the pleadings then before the court. Petitioners, however, declined to avail themselves of this privilege. The suit thus brought was a friendly one, and, as stated by the Supreme Court, Park v. Greenwood County, 174 S. C. 35, 176 S. E. 870, 871, three issues were presented for determination, namely:

"(1) May the Legislature permit or authorize a county to construct and operate a hydroelectric plant for the uses referred to above?

"(2) Do the revenue bonds issued, or here sought to be issued, pursuant to the Act of May 8, 1933, constitute debts within the limitations of section 7 of article 8 and sections 5 and 6 of article 10 of the Constitution?

"(3) Does the proposed ordinance, submitted as an exhibit to the pleadings, comply with the provisions of the Act of May 8, 1933?"

The decision of the court was upon these three issues alone, and all of the questions were answered in the affirmative. The uses and purposes referred to in question No. 1 were stated by the court, as follows: "It appears that Greenwood county has made application to the Public Works Administration, under the provisions of the Revenue Bond Act of May 8, 1933 (38 Stat. at Large [S. C.], p. 411), as amended, for a loan to be used in the erection of a hydroelectric plant at 'Buzzard Roost' on the Saluda river; the electrical energy generated to be sold by the county to cities, towns, corporations, and individuals within and without its territorial limits."

Plaintiffs herein, in order to intervene, and as a basis of their right to intervene, not only raised substantially the questions decided by the Supreme Court, but also (paragraph 7 et seq.) set up, among other additional issues, their status as owners of valuable franchises, their compliance with all rules and regulations of regulatory authorities, the large expenditures which they have made in establishing their plants in this state, through which they had given employment to many thousands of people, and the resultant danger of depriving them of a large part, if not the whole, of their business in Greenwood county and adjoining counties by means of unlawful competition. They also (paragraph 9) alleged that neither the complaint nor the return and answer in said suit raised all the issues of fact or of law upon which the sound and just judicial determination of the validity of the acts and proceedings of the defendants with respect to said power project depended, and that there had not been invoked all applicable provisions of the state and federal law, nor the applicable provisions of the State and Federal Constitutions, either expressly or impliedly. Therefore, the petitioners for intervention in that cause, as plaintiffs here, clearly cannot be held to be concluded by the decision in that case from now asserting any of the new issues herein presented. The concrete rights asserted by the plaintiffs in the instant case to be protected against unfair and illegal competition, and their right to invoke the provisions of the Federal Constitution herein asserted, were left out of the question entirely. No question was made, or permitted to be made, of their status and obligations as holders of public utilities franchises, nor of the nature of the contracts proposed to be entered into with customers and with the Public Works Administration, including the method of fixing rates, nor of numerous other questions here involved. I hold that the decision of the Supreme Court of South Carolina is controlling to the extent, and to the extent only, of the issues decided in the state case, but that the plea of res adjudicata must be overruled and dismissed because of other issues herein presented and undetermined by that decision, especially since neither were the plaintiffs parties, nor was the defendant Administrator party, to that cause.

■■■ 2. *Compliance with the Terms of the Public Works Administration Act (Title 2, N. I. R. A. [40 USCA § 401 et seq.]).*— The plaintiffs have laid considerable stress upon the contention that the proposed contract *is* ultra vires, because *it is violative* of and not in compliance with the terms of the act, nor of the comprehensive program adopted by the President for the administration of Public Works Administration funds, and for the reason that the

credit of the county is not pledged to secure the payment of the bonds, and there is no sufficient guaranty on the part of the county that the project will be completed. The contention that the proposed contract is ultra vires, because the credit of the county is not pledged to secure the payment of the bonds, is, I think, without merit. Unquestionably, a large discretion is vested in the Administrator, with which the courts may not interfere, especially unless there is such abuse of that discretion as to justify intervention. Furthermore, the act itself, providing for the appointment of the Administrator, and the laws of the state, specifically make provision for self-liquidating projects of the character here proposed. The suggestion of the absence of compliance with the statute by failure to adopt a sufficiently comprehensive program is also without merit. The contention, however, that the contract is ultra vires, because violative and not in compliance with the terms of the act, nor of the comprehensive program adopted by the President, and that there is no sufficient guaranty on the part of the county that the project will be completed, presents another question.

■ Significant among the provisions of the act, section 203 (d), 40 USCA § 403 (d), is the authorization of the President to extend the benefits of the act "to any State, county, or municipality notwithstanding any constitutional or legal restriction or limitation on the right or power of such State, county, or municipality to borrow money or incur indebtedness." The act thus empowers the President to aid such state, county, or municipality in the performance of an unconstitutional act, irrespective of the injury that may result to taxpayers or their businesses. Significant, also, in the rules prescribed by the President, Circular No. 1, July 31, 1933, is the provision, section 8, page 8, that among the projects to be preferred as to the grant shall be included "projects for the transmission of electrical energy into territories not now served," and that "the grant will not be allowed unless the public body either (a) has power to sell to the United States its bonds in sufficient amount to reimburse the United States for its outlay (less the grant if allowed) in connection with the project and enters into a contract so to do and to complete the project, or (b) has power to convey the site of the project to the United States and contracts so to do,

and to pay rental sufficient to reimburse the United States for its outlay less the grant if allowed, and to complete the project, or (c) is in process of securing the necessary powers and the Administrator is convinced that such powers will be obtained, or (d) in special cases as the President may determine." The first of the provisions above referred to clearly indicates that it was not intended to aid by grant the establishment of projects for the transmission of electrical energy into territories which, as here, are now adequately and fairly served at reasonable rates, and that, in proposing to do so in the instant case, the Administrator is not complying with the terms of the comprehensive program. Furthermore, the latter provision referred to is a specific limitation upon the authority of the Administrator to extend the grant in any case where a county fails to enter into a contract to complete the project, or to convey the site of the project, and contracts to do so, and to pay rental sufficient to reimburse the United States for its outlay, or is in process of securing these powers so as to convince the Administrator that they will be obtained, or in special cases as the President may determine. Certainly there is no indication here that the President has made a determination in this special case. The contract entered into, in pursuance of this program, limits the application of the funds derived from the grant and the bonds to the *construction* of the plant, and does not extend it to the *purchase* of the site. Taken in connection with the rules prescribed in this circular, which requires the county itself to provide for preliminary expenses and the showing of title to the site of the plant, we are of opinion that it was not intended to confer upon the Administrator the right to allocate funds, either by loan or grant, for purposes other than construction. To do so would be ultra vires upon the part of the Administrator, and not only would the county be charged by the terms of the contract with the payment of whatever expenses should be required to procure the authorization and issuance of the bonds, but also for the acquisition of the site of the plant out of its general funds, with the result that the plaintiffs, as taxpayers, would be required to contribute thereto. We find nothing in the act, nor in the rules prescribed by the President, nor in the contract, to authorize or require the application of Public Works Administration funds for this pur-

pose. Let it be borne in mind, as above stated, that what the county proposes to do is not in the exercise of ordinary governmental functions, but is to establish a proprietary business; that the situation of the county differs from that ordinarily occupied by cities and towns already in control of the streets and other properties necessary for the enlargement or construction of municipal lighting plants. In this connection, let it be further remembered that the motion admits the allegations of the bill that the loan and grant combined are insufficient to provide for the completion of the project, and that the estimated revenues are insufficient to make the project self-liquidating, and thereby "reasonably secure" the payment of the loan.

■ 3. *Unlawful Delegation of Legislative Powers by the Act.*—Properly construed, if the act be held to be constitutional, there is no unlawful delegation of legislative powers therein, and the decision in the case of Panama Refining Co. v. Ryan, 293 U. S. 388, 55 S. Ct. 241, 79 L. Ed. —, is not applicable. I do not think, however, that the act delegates, nor was intended to delegate, to the President, nor to the Public Works Administration, any power to regulate the rates of utilities companies. That power, where it exists in matters affecting interstate commerce, is delegated to other bodies, and the assumption of that power to accomplish the declared purpose of the Public Works Administration to force utilities companies to lower their rates, without regard to their ability to do so, or consequent confiscatory results, would be ultra vires and not within the terms of the act. The decision, however, should rest upon result rather than purpose, which is always presumed as the natural consequence of an act.

■■ 4. *Plaintiffs' Right to Maintain the Suit.*—A number of cases have recently been decided by the lower courts involving this and other questions here presented. These decisions are not in harmony, and it would too greatly prolong this opinion to review them in detail. The Supreme Court has definitely decided that one's mere status as a federal taxpayer presents no justiciable controversy, and confers no right to challenge the constitutionality of an act of Congress. To authorize such challenge in a court of equity, it is necessary that the complainant, because of the exercise of an unconstitutional act authorized by Congress, shall have suffered, or be threat-

ened with subjection to, some special injury, differing in character and degree from that suffered in common with other taxpayers. Commonwealth of Massachusetts v. Mellon (Frothingham v. Mellon), 262 U. S. 447, 43 S. Ct. 597, 600, 67 L. Ed. 1078. It was held in these cases, quoting from Cherokee Nation v. Georgia, 5 Pet. 1, 75, 8 L. Ed. 25, that: "It is only where the rights of persons or property are involved, and when such rights can be presented under some judicial form of proceedings, that courts of justice can interpose relief. This court can have no right to pronounce an abstract opinion upon the constitutionality of a state law. Such law must be brought into actual or threatened operation, upon rights properly falling under judicial cognizance, or a remedy is not to be had here." Further discussing the Frothingham Case, 262 U. S. 447, at page 488, 43 S. Ct. 597, 601, 67 L. Ed. 1078, the court said: "We are not now speaking of the merely ministerial duties of officials. Gaines v. Thompson, 7 Wall. 347, 19 L. Ed. 62. We have no power per se to review and annul acts of Congress on the ground that they are unconstitutional. That question may be considered only when the justification for some direct injury suffered or threatened, presenting a justiciable issue, is made to rest upon such an act." The last-quoted case furnishes an interesting discussion in which is clearly outlined the difference between merely ministerial acts, which the court may review, and acts done in the exercise of official discretion, which the court is powerless to review. It is significant, however, that one of the justifications of this decision, and others previously rendered, was the negligible amount of tax exacted from its citizens by the Federal Government. The decision antedated recent enactments of Congress providing for appropriations reaching into many billions of dollars per year, in amounts so vast as to stagger the imagination. Certainly it cannot now be said that these taxes are negligible, especially where the taxpayers, as in the case of public utilities companies, operating under state or federal franchises, and, therefore, subjected to special burdens, must pay out of their revenues large amounts by way of income or privilege taxes. Furthermore, the plaintiffs here do not base their rights upon their status as federal taxpayers, but as taxpayers of the state of South Carolina and of the counties in which the enterprise sought to be

enjoined is to be established, and although a self-liquidating project, the contract requires of the county certain outside expenditures to which the plaintiffs, as taxpayers, must contribute. As such, their right to maintain an action to challenge the constitutionality of a state statute has long been an established principle in South Carolina, in the states generally, and in federal courts vested with jurisdiction. I fail to discover any valid reason why, by the same principle, a federal court should be denied the right to pass upon the constitutionality of an act of Congress which results, in its last analysis, in the exaction of a tax payable to the state. As stated above, however, the plaintiffs not only ground their claim upon their status as taxpayers of the state, but also on the ground that, as holders of valuable franchises, they are subjected to unfair and illegal competition. I think, therefore, that the case, in that respect, comes squarely under the decision in Frost v. Corporation Commission, 278 U. S. 515, 49 S. Ct. 235, 237, 73 L. Ed. 483. The appellant in that case owned a cotton ginning business, which he operated under a permit from the State Corporation Commission of Oklahoma. Under a statute, originally passed in 1915 (Laws Okl. 1915, c. 176), and amended from time to time, cotton gins are declared to be public utilities, and their operation for the purpose of ginning seed cotton to be a public business. The State Corporation Commission is empowered to fix their charges and to regulate and control them in other respects. No gin can be operated without a license from the Commission, to secure which is required a satisfactory showing of public necessity. Some time after the passage of the original act, it was amended by the addition of a proviso (Laws Okl. 1925, c. 109) : "That on the presentation of a petition for the establishment of a gin to be run co-operatively, signed by one hundred (100) citizens and taxpayers of the community where the gin is to be located, the Corporation Commission shall issue a license for said gin." By an act of the Legislature passed in 1917 (Laws Okl. 1917, c. 22), permission was given for the formation of co-operative agricultural or horticultural associations not having capital stock or being conducted for profit, for the purpose of mutual help by persons engaged in agriculture and horticulture. In 1919, an act was passed (Laws Okl. 1919, c. 147) permitting ten or more persons to form a corporation for the purpose of conducting, among others, an agricultural or horticultural business upon a co-operative plan, with certain provisions for the issuance and sale of capital stock, the limitation upon the number of shares permitted to be held by one person, payment of dividends, the setting aside of a surplus or reserve fund, the setting aside of 5 per cent. for educational purposes, and the manner in which the remainder of the profits of the corporation must be apportioned among its members. The appellee Durant Company was organized in 1926, under the act of 1919, and made application for a permit to establish a cotton gin at Durant, covering the same location as that for which the appellant had obtained his permit under a showing of public necessity. Upon the filing of the application of appellee company for a permit, appellant protested in writing, and there was a hearing before the Commission upon the ground that there was no showing of public necessity for the establishment of this additional utility. The Commission, however, rejected the offer to show that there was no further necessity, and held that the proviso made it mandatory to grant the permit applied for, without regard to necessity. Thereupon, suit was brought to enjoin the Commission from issuing the permit, and to enjoin the Durant Company from the establishment of its enterprise, upon the ground that the proviso, as construed and applied by the Commission, was invalid as contravening "the due process and equal protection of the law clauses of the Fourteenth Amendment." The Supreme Court, reversing the lower court, sustained these contentions. The whole opinion is instructive, but, for the purposes of this case, we need only quote the following: "Appellant, having complied with all the provisions of the statute, acquired a right to operate a gin in the city of Durant by valid grant from the state acting through the corporation commission. While the right thus acquired does not preclude the state from making similar valid grants to others, it is, nevertheless, exclusive against any person attempting to operate a gin without obtaining a permit or, what amounts to the same thing, against one who attempts to do so under a void permit, in either of which events the owner may resort to a court of equity to restrain the illegal operation upon the ground that such operation is an injurious invasion of his property rights. * * * The injury threatened by such an invasion is the

impairment of the owner's business, for which there is no adequate remedy at law. * * * Immunity to one from a burden imposed upon another is a form of classification and necessarily results in inequality; but not necessarily that inequality forbidden by the Constitution. The inequality thus prohibited is only such as is actually and palpably unreasonable and arbitrary. * * * The purpose of the clause in respect of equal protection of the laws is to rest the rights of all persons upon the same rule under similar circumstances. * * * This Court has several times decided that a corporation is as much entitled to the equal protection of the laws as an individual. * * * The converse, of course, is equally true. A classification which is bad because it arbitrarily favors the individual as against the corporation certainly cannot be good when it favors the corporation as against the individual. In either case, the classification, in order to be valid, 'must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.' " The court further declared: "That the immunity thus granted to the corporation is one which bears injuriously against the individual does not admit of doubt, since by multiplying plants without regard to necessity the effect well may be to deprive him of business which he would otherwise obtain if the substantive provision of the statute were enforced." See, also, Public Service Commission v. Great Northern Utilities Co., 289 U. S. 130, 53 S. Ct. 546, 77 L. Ed. 1080; Hegeman Farms Corporation v. Baldwin, 293 U. S. 163, 55 S. Ct. 7, 79 L. Ed. —.

In the instant case, the bill alleges, and the motion admits, plaintiffs' franchises and compliance with the law. Their obligation to adequately serve the communities proposed to be served by the Buzzard Roost Project is admitted, as well as their ability to do so. That their rates are fair and reasonable is also admitted, as also that they will suffer irreparable injury by the competition proposed. In this connection, it should be borne in mind that what the county proposes to do does not involve one of the ordinarily administrative functions of the government, but the establishment of a proprietary business of the same identical character as that of the plaintiffs, and for which the bill alleges, and the motion to dismiss admits, there is no necessity. If

the county may do this without reference to the property rights and franchises of the plaintiffs, the business which the plaintiffs are required to continue, as well as the service which they are required to furnish, is in imminent danger of being impaired, if not destroyed. It is to be noted that in City of Allegan v. Consumers' Power Co. (C. C. A. 6) 71 F.(2d) 477, much relied upon by the defendants, as well as certain others of the cases in which injunction was refused, the decision turned entirely upon the right of the plaintiffs, as taxpayers, to maintain their causes in equity. In 5 Pomeroy's Equity Jurisprudence (2d Ed.) §§ 583, 584, p. 4558 et seq., will be found a succinct and accurate statement of the law declaring an injunction to be the appropriate remedy to protect a party in the enjoyment of both an exclusive and nonexclusive franchise against continuous encroachments. See, also, Gallardo v. Porto Rico Railway, Light & Power Co. (C. C. A. 1) 18 F.(2d) 918, 922; City of Campbell, Mo. v. Arkansas-Missouri Power Co. (C. C. A. 8) 55 F.(2d) 560, 562; Iowa Southern Utilities Co. v. Cassill (C. C. A. 8) 69 F.(2d) 703, 704; Oklahoma Utilities Co. v. City of Hominy (D. C. Okl.) 2 F. Supp. 849, 851; Missouri Public Service Co. v. City of Concordia, Mo. (D. C. Mo.) 8 F. Supp. 1, 4; Princeton Power Co. v. Calloway, 99 W. Va. 157, 128 S. E. 89; Puget Sound Traction, L. & P. Co. v. Grassmeyer, 102 Wash. 482, 173 P. 504, L. R. A. 1918F, 469, 474. In passing upon the foregoing issue, it must be understood that nothing that has been said is intended to challenge the abstract rights of a county or municipality in South Carolina, under the State Constitution, to establish utilities plants of the character proposed, nor the abstract right, where legally authorized to do so, to fix rates. The plaintiffs base their right to equitable intervention upon the concrete claim that the county proposes to establish a proprietary business enterprise and enter into illegal and unfair competition, and to fix illegal and ruinous rates, in competition with the plaintiffs, as public utilities companies, who are burdened by law with many other expenses and obligations from which the county is relieved.

Having disposed of the issues embraced in the foregoing discussion, we come now to what is regarded as the most important and far-reaching of the issues presented, presenting questions of law at once diffi-

864

cult and delicate of determination, and requiring most extensive investigation and most serious deliberation. These involve:

■ 5. *Constitutionality of Title 2 of the Act, Providing for the Establishment of the Public Works Administration, as Applicable to the Facts of this Case.*—It is the plaintiffs' contention that the authority thus conferred by Congress is not embraced within any of the delegated powers of Congress, and is also violative of the Fifth, Tenth, and Fourteenth Amendments to the Constitution. The defendants assert its constitutionality under the congressional powers conferred by article 1, § 8, of the Constitution, and, particularly, under clause 1, empowering Congress "to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States * * *"; also, under clause 3 of that section, empowering Congress "to regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes"; also, under the general or collective powers embraced in clause 18 of that section, "to make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof"; and under article 4, § 3, cl. 2, by which Congress has power to dispose of the property of the United States. I conceive it to be a duty from which I may not escape to determine the constitutional issues thus presented, and upon which the plaintiffs have invoked, and have a right to require, my conclusions. I am fully conscious of the responsibility thus imposed, and of the rule, which has frequently and uniformly been reiterated by the Supreme Court, that a legislative act should not be declared unconstitutional in any respect except for the clearest and most convincing reasons. The rule laid down by the Supreme Court of South Carolina goes to the extent of declaring that such an act should not be declared unconstitutional unless its infirmity appears to the satisfaction of the court beyond a reasonable doubt. These principles are founded upon the soundest and most impelling of reasons. The positive provisions of all our Constitutions, state and national, dividing as they do the powers to be exercised by government into three branches, forbid the encroachment by one branch up-

on the just prerogatives of another. The courts have no right in the abstract to interfere with the enforcement of a legislative act, nor even to declare it unconstitutional, unless empowered by the Constitution itself to intervene for the protection of personal or property rights guaranteed by that instrument. On the other hand, where a right exists and is invoked, which the Constitution makes it the duty of the courts to protect, they may not, without dereliction of duty and betrayal of their trust, decline to function. Therefore, it follows that they are charged with no higher or more imperative duty than that of protecting the citizens against unconstitutional encroachments upon the rights guaranteed by that document. We are confronted here with a case which requires extreme caution, and which, if such were ever permitted, would justify the greatest reluctance to decide. We take judicial cognizance of the facts set out in section 1, title 1, of the National Industrial Recovery Act (15 USCA § 701), that the country was and is confronted with a national emergency productive of widespread unemployment and disorganization of industry, and that Congress was called upon to exercise every reasonable means within its constitutional powers to relieve that emergency. Confronted as it was and is with a situation so desperate, and with the further necessity of taking immediate and drastic steps for relief by calling into exercise every power with which it is clothed by the Constitution, and with exercising those powers to the utmost limits of the grant, it was naturally to be anticipated that some of the enactments of the Congress would transcend the constitutional limitations. In the twilight zone of these limitations it should be no matter of criticism, and certainly it is not the intention of the court to criticize Congress for lack of discernment of the exact boundary of its powers, nor of the executives for carrying into effect the enacted laws. It was almost inevitable that mistakes should be made. If and when these should occur they had and have a right to rest upon the assurance that the power of the courts should be invoked, and would be invoked, to correct their error, and to preserve and defend all constitutional guaranties, as by their oaths, as well as those of the courts, they are bound. If and when, therefore, the courts are called upon to discharge this duty of preserving constitutional rights, they should naturally receive the commend-

ation rather than the condemnation of the legislative and executive authorities, as well as the general public, who, in common with the courts and as a matter of patriotism, must or should desire the preservation of these fundamental rights. The fact, in so far as it be a fact, that powers within the constitutional grant had not previously been asserted, would furnish no consideration whatever for denying the present right to invoke these powers. However, it is well settled, as stated in Home Building & Loan Association v. Blaisdell, 290 U. S. 398, 425, 426, 54 S. Ct. 231, 235, 78 L. Ed. 413, 88 A. L. R. 1481, that: "Emergency does not create power. Emergency does not increase granted power or remove or diminish the restrictions imposed upon power granted or reserved. The Constitution was adopted in a period of grave emergency. Its grants of power to the federal government and its limitations of the power of the States were determined in the light of emergency, and they are not altered by emergency. What power was thus granted and what limitations were thus imposed are questions which have always been, and always will be, the subject of close examination under our constitutional system. While emergency does not create power, emergency may furnish the occasion for the exercise of power." And, quoting from Wilson v. New, 243 U. S. 332, 348, 37 S. Ct. 298, 61 L. Ed. 755, L. R. A. 1917E, 938, Ann. Cas. 1918A, 1024, the court further said: "Although an emergency may not call into life a power which has never lived, nevertheless emergency may afford a reason for the exertion of a living power already enjoyed." If emergency could be construed to grant new powers to Congress, the mere declaration by Congress that an emergency exists in any particular would permit an enlargement of legislative privileges and the consequent amendment of the Constitution, in contradiction and destruction of the requirements of that instrument. That may not be done by any one or the combined co-operation of all of the co-ordinate branches of the government. It may not be accomplished by legislative, executive, and judicial co-operation. It may not be done by co-operation of these with the Legislatures of every state in the Union. The right of amendment is reserved to the people from whom the powers conferred expressly emanated, and whose voice, by a two-thirds vote, either through delegates in constitutional conventions assembled or represent-

atives in the Legislatures of two-thirds of the states, must determine. If it were otherwise, the guaranties for which our ancestors, particularly those of Anglo-Saxon blood, fought for almost a thousand years, could be bartered away at will. Acquaintance with current affairs brings to view the claims of certain public writers and public speakers, who maintain that the Constitution was intended to be an elastic instrument, to be interpreted in the light of modern needs, and that it is the duty of the courts to construe the instrument in the manner best suited to reach those needs. If this were permissible, and the courts and the legislative bodies were required to meet the demand of every passing clamor, the rights obtained through the years of sacrifice of our ancestors would soon be wiped out. We prefer to follow the view expressed by the late Mr. Chief Justice Taft, who said, in effect, that our form of government could not be changed by judicial pronouncement. Time will not permit us in this opinion to review the various steps through which our independence was achieved and our liberties guaranteed under the provisions of the supreme law of the land. The fact remains that the purposes of these sacrifices were finally accomplished and guaranteed in the adoption of the Constitution, under which for approximately one hundred and fifty years the nation has grown and prospered, and enjoyed a degree of liberty beyond that of any other nation on earth. The battle cry of our soldiers in the World War was to make the world safe for democracy. Among the results accomplished was the dethronement of many kings and emperors. There was universal approval and gratification in America at the accomplishment of this first purpose. There followed in many countries the establishment of so-called republican forms of government; but the second great and indispensable necessity of constitutionally guaranteeing the liberties thus obtained was omitted, and the tragic results are known to all. Instead of the guaranty of liberty to the people, there were set up dictatorships, more absolute and more oppressive in many instances than anything that had existed under more or less absolute monarchs. The sanctity of the home, the right to acquire property and to enjoy the fruits of one's industry, the right of religious worship, freedom of speech, and many other things jealously guarded by our Constitution, were and are disregarded. It is due to the gallant members of the

American Legion, and to their comrades in arms who made the supreme sacrifice, that America should see to it that their struggles and sacrifices were not in vain. To that end every guaranty of our Constitution should be preserved, and every encroachment thereon resisted. The government under which we live and prosper is essentially a republican form of government, and utterly opposed not only to royal domination, from which we were freed by the Revolution, but equally opposed to other forms, whether communistic, socialistic, bureaucratic, or dictatorial. If it should ever occur that the people desire to substitute one of these forms, let it be accomplished by proper amendment of the Constitution as the law provides.

Coming specifically to the consideration of the question of the preservation of property rights involved in the instant case, the pronouncement of the Supreme Court in City of Knoxville v. Knoxville Water Co., 212 U. S. 1, 18, 29 S. Ct. 148, 154, 53 L. Ed. 371, is in point and impressive. Among other things, the court said: "Our social system rests largely upon the sanctity of private property; and that state or community which seeks to invade it will soon discover the error in the disaster which follows. The slight gain to the consumer, which he would obtain from a reduction in the rates charged by public service corporations, is as nothing compared with his share in the ruin which would be brought about by denying to private property its just reward, thus unsettling values and destroying confidence." The defendants' claim of constitutionality is to be tested by the settled principle that the United States Government is one of delegated powers, which Congress may not transcend, and that the right to legislate must depend upon specific constitutional grant or be necessarily incidental thereto. So far as the rights conferred under clause 18, § 8, article 1 of the Constitution are concerned, they so obviously are limited to the specified purposes named in other clauses of that section as to need no comment, and, indeed, the argument of counsel is practically, if not entirely, limited to claims of right arising out of clauses 1 and 3 of said section, popularly designated as the general welfare and commerce clauses. Furthermore, the mention of clause 2, § 3, art. 4, in the argument is rather incidental than otherwise. The National Industrial Recovery Act itself in terms declares the policy of Congress to remove obstructions to the free flow of interstate and foreign commerce, and to provide for the general welfare, and bases its assertion of authority on the power conferred by the clauses thus invoked. We think that it will be sufficient, therefore, to limit our further discussion to these two clauses and consider them in their inverse order.

A. *Commerce.*—That the legislation in question does not come within the powers of Congress under the commerce clause seems too well settled to require argument. If there could have existed any doubt under the Constitution as originally adopted, that was effectually removed by the subsequent and almost immediate adoption of the first ten amendments, each in turn being a restriction upon federal power, and each specifically prohibiting the enactment of laws regarding matters affecting individual rights and local self-government, the Fifth Amendment affecting particularly property as well as personal rights, the Ninth Amendment, declaring that "the enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people," and the Tenth Amendment, especially reserving to the states, respectively, or to the people, all powers not delegated—and, I may add, not specifically delegated—to the United States by the Constitution, nor prohibited by it to the states.

What is interstate commerce, and when an article locally produced or manufactured becomes the subject thereof, has frequently from an early period of our national existence been clearly defined and outlined, and no principle seems more clearly established than that the regulatory powers of Congress, under the commerce clause, may not be invoked as to purely intrastate enterprises. The first clear case thus decided was that of Gibbons v. Ogden, 22 U. S. (9 Wheat.) 1, 83, 189, 6 L. Ed. 23, where the court, speaking through Mr. Chief Justice Marshall, said: "The subject to be regulated is commerce; and our constitution being, as was aptly said at the bar, one of enumeration, and not of definition, to ascertain the extent of the power, it becomes necessary to settle the meaning of the word. * * * Commerce, undoubtedly, is traffic, but it is something more—it is intercourse. It describes the commercial intercourse between nations, and parts of nations, in all its branches, and is regulated by prescribing

rules for carrying on that intercourse. * * * It has, we believe, been universally admitted, that these words comprehend every species of commercial intercourse between the United States and foreign nations. * * * The subject to which the power is next applied, is to commerce, 'among the several states.' The word 'among' means intermingled with. A thing which is among others, is intermingled with them. Commerce among the states, cannot stop at the external boundary line of each state, but may be introduced into the interior. It is not intended to say, that these words comprehend that commerce, which is completely internal, which is carried on between man and man in a state, or between different parts of the same state, and which does not extend to or affect other states. Such a power would be inconvenient, and is certainly unnecessary. * * * The genius and character of the whole government seem to be, that its action is to be applied to all the external concerns of the nation, and to those internal concerns which affect the states generally; but not to those which are completely within a particular state, which do not affect other states, and with which it is not necessary to interfere, for the purpose of executing some of the general powers of the government. The completely internal commerce of a state, then, may be considered as reserved for the state itself." See, also, Brown v. Maryland, 25 U. S. (12 Wheat.) 419, 6 L. Ed. 678. The language of Mr. Justice Lamar in Kidd v. Pearson, 128 U. S. 1, 20, 9 S. Ct. 6, 10, 32 L. Ed. 346, is particularly applicable here, to the effect that: "No distinction is more popular to the common mind, or more clearly expressed in economic and political literature, than that between manufactures and commerce. Manufacture is transformation—the fashioning of raw materials into a change of form for use. The functions of commerce are different. The buying and selling and the transportation incidental thereto constitute commerce; and the regulation of commerce in the constitutional sense embraces the regulation at least of such transportation." Quoting from County of Mobile v. Kimball, 102 U. S. 691, 702, 26 L. Ed. 238, the learned Justice further said: "Commerce with foreign nations and among the states, strictly considered, consists in intercourse and traffic, including in these terms navigation and the transportation and transit of persons and property, as well as the purchase, sale,

and exchange of commodities." Continuing, the court said: "If it be held that the term includes the regulation of all such manufactures as are intended to be the subject of commercial transactions in the future, it is impossible to deny that it would also include all productive industries that contemplate the same thing. The result would be that congress would be invested, to the exclusion of the states, with the power to regulate, not only manufacture, but also agriculture, horticulture, stock-raising, domestic fisheries, mining,—in short, every branch of human industry. For is there one of them that does not contemplate, more or less clearly, an interstate or foreign market? * * * The power being vested in congress and denied to the states, it would follow as an inevitable result that the duty would devolve on congress to regulate all of these delicate, multiform, and vital interests,—interests which in their nature are, and must be, local in all the details of their successful management." The court goes on to call attention to the danger, in attempting to regulate internal affairs, of conflict between the state and federal laws, saying: "A situation more paralyzing to the state governments, and more provocative of conflicts between the general government and the states, and less likely to have been what the framers of the constitution intended, it would be difficult to imagine." See, also, License Tax Cases, 5 Wall. 462, 470, 18 L. Ed. 497. There followed decisions by the Supreme Court to the same effect and further outlining the specific requirements to constitute an article one in interstate commerce. A recent one is that of Chassaniol v. City of Greenwood, 291 U. S. 584, 54 S. Ct. 541, 78 L. Ed. 1004, wherein the court declared that ginning cotton, transporting it to a place within the same state, and warehousing, buying, and compressing it there, are each steps in preparation for the sale and shipment in interstate or foreign commerce, but that each of such steps prior to the sale and shipment is local, and a transaction in intrastate commerce. In Hammer v. Dagenhart, 247 U. S. 251, 38 S. Ct. 529, 531, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724, the court, quoting from In re Greene (C. C.) 52 F. 104, 113, stated: "When the commerce begins is determined, not by the character of the commodity, nor by the intention of the owner to transfer it to another state for sale, nor by his preparation of it for transportation, but by

its actual delivery to a common carrier for transportation, or the actual commencement of its transfer to another state." See, also, Coe v. Town of Errol, 116 U. S. 517, 6 S. Ct. 475, 29 L. Ed. 715.

In the light of these cases, and many others to the same effect, we fail to find the slightest justification of the right of Congress to legislate in the instant case under the commerce clause. The proposed project is not only limited to doing business within the state boundaries, but is further limited to certain counties in the state, and the legislative act under which its authority was granted to the same extent limited the territory in which it was given the right to conduct the business. In argument, counsel for the defendants suggested, but did not argue in extenso, the right of Congress to aid the project for the purpose of regulating the flow of the stream, and thus contribute to its navigability at points nearer the sea. It was not contended, however, that the stream is or may be made commercially navigable at or near Buzzard Roost, nor that in establishing the project anything further was contemplated than to develop, transmit, and sell electrical power locally. Congress has not acquired, nor attempted to acquire, the plant, nor does the contract contemplate its acquisition, maintenance, or operation for any purpose other than that of operating the electrical power project as stated in the contract and in the acts authorizing its construction by Greenwood county. I see no merit, therefore, to this contention.

B. *General Welfare.*—Both before and ever since the adoption of the Constitution, the proper interpretation of its general welfare clause has been the subject of much discussion and controversy. At the beginning, the chief exponent of the contention that it should itself be interpreted to enlarge the powers of Congress, and, independently of all other sections, confer a substantive right to legislate upon all matters affecting the common good of the nation, and clothing Congress with discretionary powers in the determination of what constitutes the general welfare, was Alexander Hamilton. It is well known that his views were that the Constitution should provide for a greater centralization of powers in the Federal Government. Championing the opposing view, to the effect that the expression was not intended to create any additional power in Congress, but was a term employed to qualify the purposes for which taxes, duties, imposts, and excises should be laid, was James Madison. It is also well known that the Madisonian interpretation was the one which the convention accepted and upon which it acted, and the uniform line of decisions of the Supreme Court has approved this interpretation. As operating upon this clause, the Supreme Court has uniformly recognized the restrictions placed upon Congress in other sections of the Constitution. It is a matter of common knowledge that the antagonism of the people and of the several states would never have permitted the adoption of the Constitution if the Hamiltonian contention had been accepted or thought even possible. Even after the adoption of the original instrument, as stated above, the first ten amendments were almost immediately adopted for the purpose of more clearly defining this view, and of more effectively denying to Congress the right to legislate upon purely local affairs not affecting interstate commerce, and it is now generally conceded that the only substantive power granted in the clause under discussion is that of laying taxes, etc., and that the remainder of the provision, specifying the purposes for which taxes can be levied, is a limitation upon that power. Story, in his Commentaries on the Constitution, published in 1833, said (§ 919): "A power to lay taxes for any purposes whatsoever is a general power; a power to lay taxes for certain specified purposes is a limited power. A power to lay taxes for the common defense and general welfare of the United States is not in common sense a general power. It is limited to those objects. It cannot constitutionally transcend them." See 1 Willoughby on the Constitution (2d Ed.) § 61, pp. 97, 98. Further commenting upon this subject in the same work (§§ 907, 908), this learned writer and recognized authority on the interpretation of the Constitution, said that if the clause be interpreted, as is contended for by the defendants in this case, to constitute another and distinct, substantial power, "then it is obvious that, under color of the generality of the words 'and provide for the common defense and general welfare,' the government of the United States is, in reality, a government of general and unlimited powers, notwithstanding the subsequent enumeration of specific powers." We invite special attention to the able opinion of Judge Rogers in United States v. Boyer (D. C. Mo.) 85 F. 425; also to the learned opinion pro-

nounced by the Supreme Court of Massachusetts in Lowell v. City of Boston, 111 Mass. 454, 15 Am. Rep. 39; to Wiseman v. Tanner (D. C.) 221 F. 694; and to the admirable opinions of Newton D. Baker and James M. Beck, filed in their printed brief rendered to the President of the Edison Electric Institute, dated November 22, 1934–January 11, 1935.

We fail to find any case decided by the Supreme Court approving the interpretation here asserted by the defendants. In every case decided by that tribunal, and they are many, it has been uniformly held that every other section of the Constitution providing for restrictions upon the power of Congress must be given full force and effect, and that no legislation may be enacted by Congress levying taxes for other than public purposes, and that such purposes must be those of the general government and not the public purposes of a state or any political subdivision or community thereof. Congress may not legislate either for the establishment or the support of such local enterprises under the guise of general welfare. To permit this to be done would be to destroy the barriers provided in specific sections of the Constitution against congressional encroachment upon states' rights and local self-government. In Collector v. Day, 78 U. S. (11 Wall.) 113, 124, 20 L. Ed. 122, the court said: "It is a familiar rule of construction of the Constitution of the Union, that the sovereign powers vested in the State governments by their respective constitutions, remained unaltered and unimpaired, except so far as they were granted to the government of the United States. That the intention of the framers of the Constitution in this respect might not be misunderstood, this rule of interpretation is expressly declared in the tenth article of the amendments, namely: 'The powers not delegated to the United States are reserved to the States respectively, or, to the people.' The government of the United States, therefore, can claim no powers which are not granted to it by the Constitution, and the powers actually granted must be such as are expressly given, or given by necessary implication." In State of Kansas v. State of Colorado, 206 U. S. 46, 90, 27 S. Ct. 655, 664, 51 L. Ed. 956, Mr. Justice Brewer, referring to the Tenth Amendment, said that it "disclosed the widespread fear that the national government might, under the pressure of a supposed general welfare, at-

tempt to exercise powers which had not been granted. With equal determination the framers intended that no such assumption should ever find justification in the organic act, and that if, in the future, further powers seemed necessary, they should be granted by the people in the manner they had provided for amending that act." Even in passing upon those cases arising under State Constitutions, the Supreme Court has been careful to ascertain whether taxation challenged as unconstitutional could be properly designated to be for a public purpose and justified under such claim, and when found not to be so, the right has been uniformly denied as an unauthorized invasion of private right. In Citizens' Savings & Loan Association v. Topeka, 87 U. S. (20 Wall.) 655, page 663, 22 L. Ed. 455, the court said: "The theory of our governments, State and National, is opposed to the deposit of unlimited power anywhere. The executive, the legislative, and the judicial branches of these governments are all of limited and defined powers. There are limitations on such power which grow out of the essential nature of all free governments. Implied reservations of individual rights, without which the social compact could not exist, and which are respected by all governments entitled to the name." The court held that among these is the limitation of the right of taxation; that it can only be used in aid of a public object, an object which is within the purpose for which governments are established; that it cannot, therefore, be exercised in aid of enterprises strictly private, for the benefit of individuals, though in a remote or collateral way the local public may be benefited thereby; that though the line which distinguishes the public use for which taxes may be assessed from the private use for which they may not, is not always easy to discern, yet it is the duty of the courts, where the case falls clearly within the latter class, to interpose when properly called on for the protection of the rights of the citizen, and aid to prevent his private property from being unlawfully appropriated to the use of others. This case quotes with approval the decision in McCulloch v. Maryland, 4 Wheat. 316, 431, 4 L. Ed. 579, to the effect that the power to tax is the power to destroy, being "the strongest, the most pervading of all the powers of government, reaching directly or indirectly to all classes of the people." See, also, City of Parkersburg v. Brown,

870

106 U. S. 487, 1 S. Ct. 442, 27 L. Ed. 238. In Allen v. Inhabitants of Jay, 60 Me. 124, 11 Am. Rep. 185, the court said: "Taxation, by the very meaning of the term, implies the raising of money for public uses, and excludes the raising if for private objects and purposes." See, also, Cole v. City of La Grange, 113 U. S. 1, 5 S. Ct. 416, 28 L. Ed. 896; Fallbrook Irrigation District v. Bradley, 164 U. S. 112, 17 S. Ct. 56, 41 L. Ed. 369; Dodge v. Mission Township (C. C. A.) 107 F. 827, 829, 54 L. R. A. 242; Sharpless v. Mayor, etc., 21 Pa. 147, 169, 59 Am. Dec. 759. In the last-mentioned case the court said: "Taxation is a mode of raising revenue for public purposes. When it is prostituted to objects in no way connected with the public interests or welfare, it ceases to be taxation, and becomes plunder. Transferring money from the owners of it, into the possession of those who have no title to it, though it be done under the name and form of a tax, is unconstitutional for all the reasons which forbid the legislature to usurp any other power not granted to them." In Dodge v. Mission Township, supra, the court said: "A legislature cannot make a private purpose a public one by its mere fiat, and the determination of the question in any case whether or not a given object is public or private is a judicial, and is not a legislative, function." In Amazon Petroleum Corporation v. Railroad Commission (D. C. Tex.) 5 F. Supp. 639, 647, 648, the court quoting argument made by counsel now Mr. Chief Justice Hughes, in 1926, said: "I am aware that it has been suggested that such Federal power to control production within the states might be asserted by Congress because it could be deemed to relate to the provision for the common defense and the promotion of the general welfare. * * * Reference is sometimes made in support of this view to the words of the preamble of the Federal Constitution. But as Story says 'The preamble never can be resorted to to enlarge the powers confided to the general government or any of its departments. It cannot confer any power per se; it can never amount, by implication, to an enlargement of any power expressly given.'" The court calls attention to the fact that this statement was approved by the Supreme Court in Jacobson v. Massachusetts, 197 U. S. 11, 22, 25 S. Ct. 358, 49 L. Ed. 643, 3 Ann. Cas. 765. Continuing the quotation, the court says: "The suggestion to which I have referred is an echo of an attempt to construe Article 1, Section 8, subdivision 1 of the Constitution of the United States, not as a power 'to lay and collect taxes, duties, imposts, and excises, to pay the debts and provide for the common defense and general welfare of the United States,' but as conferring upon Congress two distinct powers, to wit: (1) the power of taxation and (2) the power to provide for the common defense and the general welfare. In this view, it has been urged that Congress has the authority to exercise any power that it might think necessary or expedient for the common defense or the general welfare of the United States. Of course, under such a construction the government of the United States would at once cease to be one of enumerated powers and the powers of the states would be wholly illusory and would be at any time subject to be controlled in any matter by the dominant Federal will exercised by Congress on the ground that the general welfare might thereby be advanced. That, however, is not the accepted view of the Constitution. (1 Story on the Constitution, §§ 907, 908; 1 Willoughby on the Constitution, § 22). The government of the United States is one of enumerated powers and is not at liberty to control the internal affairs of the states respectively such as production within the States, through assertion by Congress of a desire either to provide for the common defense or to promote the general welfare."

The views above expressed are uniformly sustained and amplified not only in other parts of the opinions quoted, but also in numerous other decisions of the Supreme Court. We deem it unnecessary to prolong the opinion by reference to a number of able opinions recently handed down by District Courts in cases analogous to the instant case, presenting the same view. While there are some decisions to the opposite effect, we regard them in conflict with the established law of the land.

It remains only, therefore, necessary to refer briefly to defendants' contention that, by acquiescence and failure to question the constitutionality of numerous acts of Congress, making appropriations for such purposes as the purchase of the territory of Louisiana and of Florida (unquestionably a national public purpose); the transfer of federal lands to the states (not involving taxation for the purpose of purchasing the lands, but merely appropriations to administer properties already owned by the gov-

ernment, and of which it had the right to dispose); continued appropriations in aid of agriculture and education; distribution in Jackson's day of federal surplus among the states (which did not involve the question of right of taxation); the establishment of various public bureaus, etc. We think it a sufficient reply to this contention to say that the right of a citizen, or of a state acting on behalf of its citizens to maintain as a justiciable controversy a suit, under claim of taxpayers' rights alone, to enjoin enforcement on the ground of the unconstitutionality of a statute, in each case indicated, is specifically denied by the decisions hereinbefore cited. In no case, so far as we are advised, has it been shown that the citizen elected to forego a contest in which he had a justiciable controversy. Whatever inference of acquiescence, therefore, may be drawn from failure to contest appropriations in the cases cited by counsel must be limited to that class of cases. The active and successful resistance of unconstitutional encroachments, such as are involved in the instant case, not only appears from the cases above reviewed, but from a vast number of others, all forming a line of unbroken and almost continuous contests. So far, we have limited this discussion principally, if not exclusively, to citations upon the exact issue presented. It is significant to note, however, that in the jealous guarding of the positive rights guaranteed by the Constitution, no exception has ever been made for the purpose of promoting the general welfare. When the majority of the people became convinced that slavery was an evil so great that the general welfare of the country demanded its abolition, nevertheless it was found necessary to accomplish that purpose, not by a legislative enactment, but by the adoption of the Thirteenth Amendment following the arbitrament of war. It has been held that, without a constitutional amendment, Congress may not regulate or abolish child labor, though the products manufactured thereby are intended to be used in interstate commerce. Congress had no power, *under the general welfare clause,* to prohibit the traffic in intoxicating liquors, ·nor to provide punishment for abuses thereof, until the adoption of the Eighteenth Amendment, prior to which its only powers were based upon the revenue laws, under which laws alone it is likewise permitted to regulate the traffic in opium. The general welfare clause did not authorize Congress to deal with the evils of white slavery, or motor vehicle thefts, or stealing from transportation companies, outside of the authority given under the commerce clause of the Constitution. While these matters were not expressly forbidden to Congress, in such positive language as related to property rights, right of free speech, protection from unreasonable search and seizure, etc., it was conclusively presumed that they came within the rights reserved to the states or to the people. We fail therefore to see the force of the argument that the rights here sought have been lost by acquiescence, against the fact that the same or similar rights have been so persistently asserted and so emphatically proclaimed by the Supreme Court. If and when the power of the government to the unlimited expenditure of money in the establishment of bureaus is questioned in a proper case, a different question may be presented. It is enough to say that the act here questioned, as applied to the facts of this case, extends the taxation and appropriating powers of Congress to an extent heretofore undreamed of, and that, in our judgment, the right to challenge has not been lost by previous acquiescence in any governmental policy. That many of the provisions of the act in question are constitutional is not here, and cannot be successfully, questioned. The power of Congress in its discretion to provide any unlimited amount, however extravagant, for the construction of necessary or proper public buildings, to support the army and navy, to provide for post offices and post roads, to exercise control over interstate commerce, to ·appropriate whatever funds it may find advisable therefor, and to tax for the maintenance of its governmental activities generally, even though the purpose of the act be largely to relieve unemployment and to increase the spending power of the people, is not subject to review. So long as Congress legislates within the delegated powers outlined in the Constitution, neither its power nor discretion may be reviewed by the courts. We think it pertinent here to remark that the field and the need for public appropriations have not yet been fully covered. The recognized lack of public buildings at Anderson and Greenwood furnishes apt illustration.

While personally entertaining no reasonable doubt as to the correctness of the foregoing conclusions, we take satisfaction in the assurance that whatever, if any,

errors have been committed, are subject to correction, and will, on appeal, be corrected by the courts of last resort, by whose decisions not one but all guaranties of our liberties must be preserved and defended against all enemies "foreign and domestic."

An appropriate order will be filed in accordance with the views hereinabove expressed.