**GREENWOOD COUNTY, S. C., et al. v.
DUKE POWER CO. et al.**

No. 4003.

Circuit Court of Appeals, Fourth Circuit.

Feb. 22, 1936.

SOPER, Circuit Judge, dissenting.

———◆———

W. H. Nicholson, of Greenwood, S. C., and D. W. Robinson, Jr., of Columbia, S. C. (R. F. Davis, of Greenwood, S. C., and Robinson & Robinson, of Columbia, S. C., on the brief), for appellants Greenwood County and its Finance Board.

Alexander Holtzoff, Sp. Asst. to Atty. Gen., and Jerome N. Frank, of Washington, D. C., counsel for Federal Emergency Administrator of Public Works (James W. Morris, Asst. Atty. Gen., and John W. Scott, Sp. Asst. to Atty. Gen., on the brief), for appellant Harold L. Ickes, of Washington, D. C., as Federal Emergency Administrator of Public Works.

W. S. O'B. Robinson, Jr., of Charlotte, N. C., and Newton D. Baker, of Cleveland, Ohio (W. R. Perkins, of New York City, H. J. Haynsworth, of Greenville, S. C., and J. H. Marion and W. B. McGuire, Jr., both of Charlotte, N. C., on the brief), for appellees.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

PARKER, Circuit Judge.

This is an appeal in a suit which was instituted by the Duke Power Company and its subsidiary corporation, the Southern Public Utilities Company, against the South Carolina county of Greenwood and the members of its finance board, to enjoin them from constructing an electric power plant at Buzzard Roost on the Saluda river, and from obtaining a loan and grant from the federal public works administration for the purpose of constructing it. Harold L. Ickes, as federal administrator of public works, was permitted to intervene and file answer as a defendant. The bill of complaint, as subsequently amended, asked injunctive relief on the following grounds: (1) That the project could not be constructed within the limits of the proposed loan and grant of $2,852,000 and would not earn sufficient revenue to be self-liquidating, as required of projects to be financed by the public works administration; (2) that the construction and operation of the power plant for the production and sale of electric current in large part to persons and corporations without the limits of Greenwood county was beyond the county's powers and would subject plaintiffs to competition based upon illegal and ultra vires activities on the part of the county; (3) that the proposed power plant was a purely local project, not connected with interstate commerce, and that, if the act of Congress under which the administrator was acting in agreeing to make the loan and grant (title 2 of the National Industrial Recovery Act (section 201 et seq. [40 U.S.C.A. § 401 et seq.]) should be construed as authorizing the loan or grant for such a project, the act was to that extent invalid in that it exceeded the constitutional limits of congressional power; (4) that the act was invalid in that it attempted to delegate legislative power to officials of the executive department of the government; and (5) that, in agreeing to make the loan and grant in question, the administrator was exceeding his lawful authority and was engaged in an attempt to regulate intrastate power rates in derogation of the reserved rights of the states.

A motion by defendants to dismiss the bill was denied (see Duke Power Co. et al.

v. Greenwood County (D.C.) 10 F.Supp. 854); and the case was then heard on the merits and much evidence was taken relative to the first of the grounds upon which injunction was asked. The District Judge held that there was substantial evidence to support the finding of the administrator that the project could be constructed within the limits of the loan and grant and would be self-liquidating and that his conclusion with regard thereto was binding upon the courts. See 12 F.Supp. 70, 71. He held also that he was bound by the decision of the Supreme Court of South Carolina in the case of Park v. Greenwood County, 174 S.C. 35, 176 S.E. 870, as to the power of Greenwood county to issue the bonds and enter upon the project in question, not upon the principle of res adjudicata, but because the decisions of the highest court of a state are binding in the interpretation of its Constitution and statutes. See 10 F. Supp. 854, 859. He found, however, that the rates which the county power plant would charge would be substantially less than those charged by the plaintiffs; that it was the policy of the administrator in making loans and grants to municipally owned power projects to require that the enterprise so aided establish rates lower than competing private companies and thus bring about a reduction of their rates; that the contract between the administrator and the county stipulated as a condition of the loan and grant that the county should adopt a resolution satisfactory to the administrator providing for the rates to be charged; and that the business of plaintiffs in the territory to be served by the plant of the county would be seriously and permanently injured by the erection of that plant and the competition which would result therefrom. See 10 F.Supp. 854, 857 and 858 as approved in 12 F.Supp. 70, at pages 71 and 72. He held that, because of the threat to their business which would result from this competition, plaintiffs had a standing in court to question the validity of the act under which the loan and grant were to be made, and that that act was unconstitutional, both because it was beyond the power of Congress, whether measured by the commerce clause or the general welfare clause, and because it delegated legislative power to the executive. See 12 F.Supp. 70, at pages 72 and 73. Injunction was accordingly granted restraining the defendants from carrying out their grant and loan agreement of December 8, 1934, restraining the administrator of public works from paying over to Greenwood county or its officers any funds of the federal government for the purpose of constructing or operating the Buzzard Roost project, and restraining the county and its officers from receiving federal funds for that purpose. From this decree defendants appealed to this court and docketed their appeal as case No. 3971, the record in which should be considered as a part of the record on the appeal before us.

On November 30, 1935, shortly before the appeal in No. 3971 was to be heard in this court, a contract was executed between the administrator and the county abrogating the contract of December 8, 1934, and prescribing new terms and conditions for the making of the loan and grant, but not changing the amount of either of them. This contract eliminated those provisions of the old contract which had been held beyond the powers of a municipal corporation in Arkansas-Missouri Power Co. v. City of Kennett, Mo. (C.C.A.8th) 78 F. (2d) 911, and also the provisions of the old contract which had been held by the court below to give the administrator control over the rates to be charged by the county. A new provision designed to eliminate any contention that the loan and grant were made upon conditions not embodied in the contract was inserted in the following language: "13. This agreement is made with the express understanding that neither the loan nor the grant herein described is conditioned upon compliance by the applicant with any conditions not expressly set forth herein. There are no other agreements or understandings between the applicant and the government or any of its agencies in any way relating to said project." Under the terms of this contract the administrator retained no control over the work to be done; but it was specified that certain conditions as to wages, hours of work, employment of convict labor, collective bargaining, etc., should be observed by the county and by contractors and subcontractors on the project.

Upon the contract of November 30, 1935, being called to our attention, we immediately remanded the case to the court below to the end that that court might reconsider its decision in the light of the contract and take such further action as might be appropriate. 79 F.(2d) 995. This was done because in our opinion there was probability that the case had been rendered

moot, at least as to some of the questions involved, by the execution of the new contract; and we thought that, in view of the changed situation, the lower court should be revested with jurisdiction of the entire cause with power to enter such decree as might be deemed appropriate.[1] A hearing was thereupon had in the court below at which the new contract was introduced in evidence and the testimony of the federal administrator of public works and the officers of the county was taken with reference thereto. The court excluded a part of the testimony of the administrator which we think should have been admitted, in view of the contention that his action in approving the loan and grant to the county was for the purpose of affecting power rates; but, as the testimony excluded as well as that admitted has been certified in the record and is before us, no harm has resulted from this action.

The administrator, on this hearing, denied that he intended to exercise any control whatever over the rates to be charged by the county and stated that the loan and grant were made pursuant to the fundamental purpose of the public works administration "to relieve unemployment and increase purchasing power through the construction of useful public works," and that the interest of the public works administration in the question of competitive rates went merely to the question as to whether or not the rates to be charged would repay the loan made by the administration within the time limit of the contract. Specifically, with reference to the loan to Greenwood county, he testified:

"We did not approve rates. We are not interested in rates except in so far as our experts advised us that by charging those rates at which power could be sold they could liquidate their obligation to us. The rates set out in the bond resolution of the county are initial rates. There is no reservation of the right on our part to change those rates in the future. I don't know whether the contracts which Greenwood County made for the sale of power to be produced by the project were presented to anyone in the Public Works Administration or not. They were not presented to me personally. Our experts advised us that at that rate our loan would be liquidated. It was the same interest any banker would have in buying these bonds. We would not have entered into a contract if the rates had not shown a sufficient, prospective income, based on those rates to liquidate the loan. The rates as such were not approved by the PWA authorities. We knew that those rates were sufficient. If the rate were a lower rate applied to a larger sale of power which would have been sufficient in the aggregate to liquidate the obligation to the United States that would have been a satisfactory arrangement. On the other hand, if it had been a higher rate, applied to a lesser amount of power sold which would yield enough to liquidate the obligation of the United States that would have been a satisfactory arrangement. We did not take into consideration the rates charged by the Duke Power Company in making this contract."

And at another place he said:

"Q. In the case of the Greenwood County project, you would have made the loan and grant, regardless of your views as to whether the Duke Power Company's rates were, or were not, high? A. We would have made the loan and grant to Greenwood County, regardless of the rates, or our opinion of the rates, of the Duke Power Company, if Greenwood County had the legal authority to enter into the contract with us, and if Greenwood County could satisfy us that it could liquidate the loan that we made. Those were the considerations."

He further testified that the statement of one C. E. Rose at the former hearing as to the policy of the public works administration was not correct. The pertinent portion of Mr. Rose's testimony on the former hearing is as follows:

"The Duke Company will be the only competitor of the Buzzard Roost project, so we estimated a rate schedule for the project which would yield 6.5 mills for the

[1] That the lower court may be thus revested with jurisdiction of the cause after the expiration of the term at which the decree appealed from was entered, in order that it may give consideration to some phase of the case which it has overlooked or may take into consideration matters which have occurred since the taking of the appeal, is too clear for discussion. See U. S. v. Anchor Coal Co., 279 U.S. 812, 49 S.Ct. 262, 73 L.Ed. 971; Atherton Mills v. Johnston, 259 U.S. 13, 42 S.Ct. 422, 66 L.Ed. 814; Hammond v. Schappi Bus Line, 275 U.S. 164, 171, 172, 48 S.Ct. 66, 72 L.Ed. 218; Wyant v. Caldwell (C.C.A.4th) 67 F.(2d) 374; Finefrock v. Kenova Mine Car Co. (C.C.A. 4th) 22 F.(2d) 627.

industrial consumers of good load capacity, and 8.2 mills as a municipal rate, both of which are under the Duke rates. The Duke rates do not meet with the approval of the PWA authorities. We think they are excessive, and it is because we think they are excessive that the PWA approved this grant. That is one of the reasons for the approval of the grant. As to whether, if the Duke rates had met with the approval of the PWA authorities the loan and grant would have been approved, I can say that we (meaning PWA) have never approved a project where a privately owned company has made a satisfactory adjustment. That doesn't mean we will not. It is the policy of the PWA not to approve loans and grants where privately owned utilities have reduced their rates satisfactory to the PWA, and it was in line with that policy and because of that policy that I made the investigation as to the Duke rates."

The judge below, after hearing this evidence and considering the new contract, held that there was nothing which called for a modification of his former findings and that "whatever might be the purposes, policies, and practices of the Public Works Administration in reference to competitors, in financing the instant enterprise the result to the plaintiffs would be the same. The lower rates which the enterprise may be able to charge because of government aid through its loan and grant—particularly the latter—would effectively establish a 'yardstick' or rate of charge which plaintiff's must inevitably meet, or have their business pro tanto destroyed." A decree was entered, therefore, continuing the injunction theretofore granted and making it applicable to the new contract; and from that decree the defendants again appealed.

There can be no question as to the correctness of the holding of the trial judge that he was bound by the finding of the administrator of public works to the effect that the project could be constructed within the limits of the loan and grant and would be a self-liquidating project within the meaning of the act of Congress and the policy of the public works administration. That the presumption of correctness attaches to the action of administrative officers with respect to matters committed to their discretion, and that, even where judicial review is provided for, the exercise of such discretion will not be disturbed if based upon substantial testimony and not manifestly arbitrary and unreasonable, is too well settled to admit of discussion. And it is equally clear that we are bound by the decision of the South Carolina Supreme Court in Park v. Greenwood County, 174 S.C. 35, 176 S.E. 870, to the effect that the construction of the power plant and the issuance of revenue bonds to pay for same, as contemplated by the contract with the administrator of public works, was within the powers of Greenwood county.[2] The questions upon this appeal, therefore, are narrowed to three, viz.: (1) Is the act of Congress under which the loan and grant are to be made a valid and constitutional enactment? (2) Will the action of the administrator of public works in making the loan and grant be a valid exercise of power under the act? and, (3) Are the plaintiffs in position to ask an injunction in any event?

1. The Constitutionality of the Statute.

The statute under which the administrator is acting in making the loan and grant to Greenwood county is title 2 of the National Industrial Recovery Act, 48 Stat. 200 (40 U.S.C.A. § 401 et seq.), under which $3,300,000,000 was appropriated by the Congress for the purpose of relieving unemployment throughout the country. Section 201 of that title (40 U.S.C.A. § 401) authorizes the President to create a federal emergency administration of public works, all of the powers of which shall be exercised by an "administrator" to be appointed by the President. Section 202 provides (48 Stat. 201 [40 U.S.C.A. § 402]):

"The Administrator, under the direction of the President, shall prepare a comprehensive program of public works, which shall include among other things the following: (a) Construction, repair, and improvement of public highways and park ways, public buildings and any publicly owned instrumentalities and facilities; (b) conservation and development of natural resources, including control, utilization, and purification of waters, prevention of

See, also, the later decision of Clarke v. South Carolina Public Service Authority, 177 S.C. 427, 181 S.E. 481, which holds, in addition, that neither the South Carolina statute nor the contract with the administrator of public works is to be condemned as an unconstitutional delegation of legislative authority to the lending agency.

soil or coastal erosion, development of water power, transmission of electrical energy, and construction of river and harbor improvements and flood control; * * * (c) any projects of the character heretofore constructed or carried on either directly by public authority or with public aid to serve the interests of the general public; (d) construction, reconstruction, alteration, or repair under public regulation or control of low-cost housing and slum-clearance projects; (e) any project (other than those included in the foregoing classes) of any character heretofore eligible for loans under subsection (a) of section 201 of the Emergency Relief and Construction Act of 1932, as amended [section 605b of Title 15], and paragraph (3) of such subsection (a) shall for such purposes be held to include loans for the construction or completion of hospitals the operation of which is partly financed from public funds, and of reservoirs and pumping plants and for the construction of dry docks."

Section 203 (a) of the act (40 U.S.C.A. § 403 (a) provides:

"(a) With a view to increasing employment quickly (while reasonably securing any loans made by the United States) the President is authorized and empowered, through the Administrator or through such other agencies as he may designate or create, (1) to construct, finance, or aid in the construction or financing of any public-works project included in the program prepared pursuant to section 202 [section 402]; (2) upon such terms as the President shall prescribe, to make grants to States, municipalities, or other public bodies for the construction, repair, or improvement of any such project, but no such grant shall be in excess of 30 per centum of the cost of the labor and materials employed upon such project; (3) to acquire by purchase, or by exercise of the power of eminent domain, any real or personal property in connection with the construction of any such project, and to sell any security acquired or any property so constructed or acquired or to lease any such property with or without the privilege of purchase; * * Provided, That in deciding to extend any aid or grant hereunder to any State, county, or municipality the President may consider whether action is in process or in good faith assured therein reasonably designed to bring the ordinary current expenditures thereof within the prudently estimated revenues thereof. The provisions of this section and section 202 [section 402] shall extend to public works in the several States, Hawaii, Alaska, the District of Columbia, Puerto Rico, the Canal Zone, and the Virgin Islands."

Section 206 (40 U.S.C.A. § 406) provides:

"All contracts let for construction projects and all loans and grants pursuant to this title [chapter] shall contain such provisions as are necessary to insure (1) that no convict labor shall be employed on any such project; (2) that (except in executive, administrative, and supervisory positions), so far as practicable and feasible, no individual directly employed on any such project shall be permitted to work more than thirty hours in any one week; (3) that all employees shall be paid just and reasonable wages which shall be compensation sufficient to provide, for the hours of labor as limited, a standard of living in decency and comfort; (4) that in the employment of labor in connection with any such project, preference shall be given, where they are qualified, to ex-service men with dependents, and then in the following order: (A) To citizens of the United States and aliens who have declared their intention of becoming citizens, who are bona fide residents of the political subdivision and/or county in which the work is to be performed, and (B) to citizens of the United States and aliens who have declared their intention of becoming citizens, who are bona fide residents of the State, Territory, or district in which the work is to be performed: Provided, That these preferences shall apply only where such labor is available and qualified to perform the work to which the employment relates; and (5) that the maximum of human labor shall be used in lieu of machinery wherever practicable and consistent with sound economy and public advantage."

We think that the enactment of these provisions of the statute was well within the power of Congress. It may be conceded that, under ordinary circumstances, the power would not exist to raise and expend funds for construction local in character and not connected with the exercise of any of the powers of regulation expressly conferred upon the federal government; but the circumstances under which this statute was enacted were by no means ordinary and the construction contemplated was not of isolated projects but of a vast program of public works intended to relieve a condition of unemployment which

was nationwide in scope and had become a menace, not merely to the safety, morals, health, and general welfare of vast numbers of the people, but also to the stability of the government itself. As was well said by Judge Otis in Missouri Utilities Co. v. City of California (D.C.) 8 F.Supp. 454, 458:

"Those who have studied the history of the world as well as those who are familiar only with contemporaneous events throughout the world know that the existence of a nation may be imperiled by foreign aggression not only, by civil war not only, it may be imperiled, it may be destroyed utterly, by the unreasoning rage of masses, a rage aroused by hunger, by want in every form, by a sense of injustice, a rage stirred up alike by sincere and honest, as well as by villainous, leaders. It is a rage which does not analyze, which does not discriminate. It is not content with driving the money changers from the temple; it destroys the temple itself. Every one should know that in general economic distress is possibility of grave danger to the established order. The political branches of government, that is, the executive and legislative branches, must guard and protect the national existence, if it is to be done at all, and that they can do only through the enactment and enforcement of laws. It is for them to decide whether a situation has arisen which endangers the existence or general welfare of the nation; it is for them to decide what measures shall be taken to avert dangers arising from that situation. With these decisions or their wisdom courts and judges have nothing to do save only in that case in which it has most clearly been demonstrated that the political branches of government not only have usurped powers not granted them by the Constitution, but in so doing directly have injured a litigant who has come to the courts for relief."

■ In the light of our history, it is idle to say that, in the presence of such a situation as confronted Congress, the national government must stand by and do nothing for the relief of the general distress, confining its activities to matters as to which it is given legislative powers by the Constitution. It is the only instrumentality which the people of the country have which can deal adequately with an economic crisis nationwide in scope; and there can be no question but that, for the purpose of dealing with such a crisis, it can exercise the power to raise and spend money under article 1, section 8, clause 1 of the Constitution which provides: "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and excises, to pay the Debts and provide for the common Defence and general Welfare of the United States."

■ There has been much discussion as to the meaning of this "general welfare" clause of the Constitution; but it is now definitely settled that the power of Congress to authorize expenditure of public money for public purposes is not limited by the direct grants of legislative power contained in the Constitution. Dealing with this question in the recent case of United States v. Butler, 56 S.Ct. 312, 319, 80 L. Ed. ——, the Supreme Court, speaking through Mr. Justice Roberts, said:

"Since the foundation of the nation, sharp differences of opinion have persisted as to the true interpretation of the phrase. Madison asserted it amounted to no more than a reference to the other powers enumerated in the subsequent clauses of the same section; that, as the United States is a government of limited and enumerated powers, the grant of power to tax and spend for the general national welfare must be confined to the enumerated legislative fields committed to the Congress. In this view the phrase is mere tautology, for taxation and appropriation are or may be necessary incidents of the exercise of any of the enumerated legislative powers. Hamilton, on the other hand, maintained the clause confers a power separate and distinct from those later enumerated, is not restricted in meaning by the grant of them, and Congress consequently has a substantive power to tax and to appropriate, limited only by the requirement that it shall be exercised to provide for the general welfare of the United States. Each contention has had the support of those whose views are entitled to weight. This court has noticed the question, but has never found it necessary to decide which is the true construction. Mr. Justice Story, in his Commentaries, espouses the Hamiltonian position. We shall not review the writings of public men and commentators or discuss the legislative practice. Study of all these leads us to conclude that the reading advocated by Mr. Justice Story is the correct one. While, therefore, the power to tax is not unlimited, its confines are set in the clause which confers it, and not in

those of section 8 which bestow and define the legislative powers of the Congress. It results that the power of Congress to authorize expenditure of public moneys for public purposes is not limited by the direct grants of legislative power found in the Constitution."

If it be conceded, as we think it must be, that the expenditure of public funds for the relief of nation-wide unemployment is within the power of Congress, as being an expenditure in furtherance of the general welfare of the United States, we think that it necessarily follows that expenditures for a nation-wide program of public works for the purpose of providing employment in such an emergency is within the Congressional power; for from the earliest periods of history nations have been accustomed to resort to the construction of public works as a means of relieving the unemployment of their people. Certainly, it is hard to imagine any expenditure which the federal government might make for the purpose of relieving the danger and distress arising from unemployment which would interfere so little with private business, and would have so little tendency to create a dependent attitude on the part of the people, as a program of public works. And, not only does such a program relieve unemployment by furnishing work in the construction of the immediate projects and in the manufacture of materials to be used therein, but it also makes a lasting contribution to the national wealth, and thus counterbalances to some extent the burden of the increase in the national debt which it entails. If, therefore, the relief of nation-wide unemployment be a legitimate end for Congress to have in view in the exercise of its power to raise and spend money under the "general welfare" clause, the construction of a nation-wide program of public works would seem to be a legitimate means to that end.

And we do not think that it can be said that Congress is invading the reserved powers of the states, or is making expenditures for matters essentially local in character, merely because the project for which expenditure is made is not connected with interstate commerce and, when considered alone, is local in character. It cannot be said to invade the reserved powers of a state to make loans or grants of money to municipal corporations which the state continues to control, and which are at liberty to reject the loans and grants if they see fit

to do so. And a program of works for relieving nation-wide unemployment does not lose its national character and become local merely because each of the public works projects is constructed in some particular locality. If this were true, the spending power under the general welfare clause would be limited, in the manner in which the Supreme Court has just held in United States v. Butler that it is not limited, to objects embraced within the direct grants of legislative power. No matter how clearly national the end to be attained by expenditures under the general welfare clause, or how appropriate the means adopted for the attainment of that end, each individual expenditure must needs have a local as well as a national character; for money cannot be expended in vacuo and no project can be imagined, even though part of a national program, which will not have a local situs. The national character of the program here involved is shown, however, by the fact that projects of various kinds have been commenced in 3,040 of the 3,070 counties of the country; and the magnitude of the undertaking clearly appears from the report of the administrator to the Senate, of March 22, 1934. See Senate Document No. 167, 73rd Congress, 2nd Session; Kansas Gas & Electric Co. v. City of Independence, Kan. (C.C.A.10th) 79 F. (2d) 32, 42, 43, 100 A.L.R. 1479; Id. (C.C. A.) 79 F.(2d) 638; Missouri Utilities Co. v. City of California (D.C.) 8 F.Supp. 454, 464; Iowa Southern Utilities Co. v. Town of Lamoni (D.C.) 11 F.Supp. 581.

Nor do we think that the pertinent portion of the act can be condemned as an unconstitutional delegation of legislative power within the rule laid down in Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446, and A. L. A. Schechter Poultry Corporation v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947. It was out of the question for Congress to prescribe the details of an extended program of public works. It appropriated the money for the purpose, laid down the principles which were to guide the President and the administrator of public works in its expenditure, and left to them the working out of the details. The making of loans and grants in carrying out the policy thus laid down by Congress is the exercise of administrative, not legislative, discretion. As said in Cincinnati, Wilmington & Zanesville Railroad Co. v. Clinton County Commissioners, 1 Ohio St. 77,

88, and quoted with approval by the Supreme Court in Hampton & Co. v. United States, 276 U.S. 394, 407, 48 S.Ct. 348, 72 L.Ed. 624: "The true distinction, therefore, is, between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring an authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done; to the latter no valid objection can be made."

The question was fully considered by the Circuit Court of Appeals of the Tenth Circuit in Kansas Gas & Electric Co. v. City of Independence, supra; and, on the point here under consideration, we are in thorough accord with what was said by Judge Phillips in that case. He said:

"Section 202 (40 U.S.C.A. § 402) lays down a standard as to the program of public works. It provides the program must be comprehensive and must include certain specified classes. Manifestly the Congress could not enumerate specifically the particular projects to be included in such a broad program.

"We are not called upon to decide whether the Congress could delegate to the President power to include in such program other classes of projects than those enumerated in section 202, because the project here involved falls within a specifically enumerated class.

"Sections 203 and 206 (40 U.S.C.A. §§ 403, 406) lay down standards as to what projects may be financed or aided by loans or grants. They must be public works projects; they must be projects included in the program; they must come within the limitations specified in section 206; a loan or grant must be made with a view to increasing employment quickly, and a loan must be reasonably secured.

"The making of such a loan or grant is administrative rather than legislative in character. * * *

"We conclude the Congress, at least as to the classes of projects specifically enumerated, lays down a legislative standard and declares a legislative policy with requisite definiteness, and impliedly directs the President to effectuate the purposes of the Act and to make loans and grants, within the limits of a reasonable administrative discretion, to projects that fall within the classes enumerated in section 202 and the limitations of sections 203 and 206, and that,

while Title 2 grants broad administrative authority and discretion, it does not unconstitutionally delegate legislative power."

See, also, Federal Radio Commission v. Nelson Bros. Co., 289 U.S. 266, 53 S.Ct. 627, 77 L.Ed. 1166; Union Bridge Co. v. United States, 204 U.S. 364, 27 S.Ct. 367, 51 L.Ed. 523; United States v. Hanson (C.C.A.9th) 167 F. 881.

## 2. The Exercise of Power by the Administrator.

■ As the statute is valid, the making of the loan and grant by the administrator is valid if within its terms notwithstanding the motive of the administrator in making them. As said by Judge Sibley in his concurring opinion in Tennessee Valley Authority v. Ashwander (C.C.A.5th) 78 F. (2d) 578, 583, "This case is not to be decided by the purposes and plans of the board, but by the validity of what is about to be done under the attacked contracts." See, also, Spalding v. Vilas, 161 U.S. 483, 498, 16 S.Ct. 631, 40 L.Ed. 780; Spalding v. Dickinson, 161 U.S. 499, 16 S.Ct. 637, 40 L.Ed. 786; West v. Hitchcock, 205 U.S. 80, 85, 86, 27 S.Ct. 423, 51 L.Ed. 718.

■ It is, of course, true that, as Congress may not encroach upon the reserved powers of the states, officers acting under its authority may not so encroach; and the authority of such officers in administering acts of Congress must be held to be limited by the bounds of Congressional power. The administrator, for example, could not, under the guise of carrying out the public works program, make such an expenditure of public funds as would interfere with the states in the exercise of their reserved powers. See U. S. v. Butler, supra. But we do not understand that any such thing is being done here. Greenwood county is but an agency of the state of South Carolina and remains subject to the control of that state in the management of its power project as well as in other matters. The rates to be charged by public utilities remain subject to state control. All that the administrator proposes to do is to make a loan and grant to the county to enable it to engage in an enterprise which, as a subdivision of the state, it has been given by the state the right and power to engage in. In other words, the administrator's action will not in any sense limit the powers of the state, but will furnish to the state means of exercising a power which it already possesses, i. e., the power of engaging in a

996

public business for the benefit of its citizens. We are unable to see how lending or giving money to a state agency for such purpose can be said to be an encroachment on state power. It is an entirely different thing from giving or lending money to private persons for the purpose of defeating a state policy or regulating matters under state control.

The learned judge below was of opinion that the action of the administrator should be condemned because the county would be enabled by the loan and grant to establish an enterprise which could and would charge lower rates than plaintiffs were charging and thus constitute a "yardstick" by which plaintiffs' rates would be affected. We cannot see, however, that the incidental effect which the construction of the county project may have on plaintiff's rates has any bearing on the question. The county has the right to engage in the enterprise notwithstanding the effect of its competition upon the business of plaintiffs. Puget Sound Co. v. Seattle, 291. U.S. 619, 54 S.Ct. 542, 78 L.Ed. 1025; Madera Waterworks v. Madera, 228 U.S. 454, 33 S.Ct. 571, 57 L.Ed. 915. And notwithstanding that the loan and grant to establish the enterprise are made by the administrator, the fact remains that the business is its business and subject to its control. If a "yardstick" is established, it is the county's yardstick subject to the control of the state, not of the federal government.

It is argued, however, that the purpose of the administrator in making the loan and grant is to affect the rates of plaintiffs; that the policy of the public works administration is to make loans and grants in such way as to bring about a reduction in public utility rates; and that they are not made except where the rates to be charged by the municipal enterprise which is being aided will be lower than the rates of the competing private company. To support this contention plaintiffs rely upon the testimony of C. E. Rose heretofore quoted and also a press release, referred to by the judge below in his findings of fact, as well as to certain statements made by the administrator in his recently published book entitled "Back to Work." The administrator denies under oath, however, that his policy in making loans and grants arises out of any purpose to affect rates, and specifically that the contract here in question was made with such end in view; and we feel that we would not be justified in disregarding the sworn testimony of a Cabinet Officer as to the policies which are being followed by him in the discharge of his official duties, and accepting instead mere press reports or the conflicting testimony of a minor official who may not have understood the purposes of his superior, who was the one charged with the formulation of policies and the exercise of discretion.

It is true that in the book of the administrator, just as in the press release, there are statements to the effect that the public works administration had endeavored in the approval of loans to make electric energy more broadly available at cheaper rates, and that it was its practice before approving loans to give private companies an opportunity to put in effect rates as low as those at which the municipal system would be self-liquidating; but it is manifest that it is only where the new municipal enterprises will be able to furnish lower rates than the competing private companies that there is reasonable hope of their securing sufficient business to be self liquidating projects. Loans to such enterprises would be unsound from an economic standpoint if they should be made in cases where the rates to be charged would be as high as those of existing enterprises or where the latter might lower their rates to such an extent that the municipal enterprises could not secure sufficient business to be self liquidating.

The fact, however, that the administrator may or may not be furthering his ideas as to lowering power rates or encouraging municipal ownership, would seem to have no bearing on the point under consideration, if what he is doing is in fact required by a sound financial policy in the discharge of his duties under the statute; for, as stated above, his action may not be enjoined because of his motives, if he has been given the power by a valid act of Congress to do what he is doing. The discretion as to what loans and grants shall be approved has been vested in him, not in the courts; and the courts may not interfere with the exercise of that discretion because they may not approve of the reasoning upon which it is based.

It must be remembered that this is not a case where Congress is directly or indirectly attempting to regulate intrastate power rates. The aim of Congress is to relieve unemployment through a nationwide

program of public works, one feature of which is loans and grants to states or municipalities to aid them in such public works as development of water power and the transmission of electrical energy. Such loans and grants cannot be made except in cases where the states or municipalities desire to undertake these public works, a matter which is left entirely to their decision; and, if the making of such loans and grants inevitably results, as has been suggested, in more abundant power at lower rates, this is but the incidental effect of what the states or their agencies voluntarily decide to do. Without suggesting that this incidental effect of more abundant power at lower rates might be considered as conducive to the general welfare, we see no reason why a loan or grant to a municipality which will aid in the relief of unemployment must be condemned because of it. That the administrator may have had such result in mind in approving loans and grants would seem to furnish no more ground for interference by the courts than the fact that a purchasing agent for the government might have purchased a post office site, otherwise desirable, because the location harmonized with his ideas of a proper place for the post office in considering the proper development of the city. In other words, we do not think that the exercise of a discretion vested in a federal officer by a valid act of Congress may be condemned by the courts, either as transcending the power of such officer or as an abuse of discretion, merely because some consideration of what was locally desirable may have entered into its exercise.

And we think that there is no merit in the contention that the administrator has assumed control over a local matter reserved to the jurisdiction of the states, because of the provisions of the contract as to wages, hours of labor, etc. These are stipulated by contract in advance, not left to the control of the administrator during the progress of the work. Had this been done, there is no reason to think that it would be violative of any provision of the laws of South Carolina. Clarke v. Public Service Authority, 177 S.C. 427, 181 S.E. 481. But, as it was not done, we see no ground of complaint on any score. Certainly where the federal government is making a loan to aid in the relief of unemployment, it may stipulate that the loan shall be used in such way as will best accomplish that purpose.

**3. Right of Plaintiffs to Injunction.**

For the reasons heretofore stated, the plaintiffs are not entitled to an injunction; but, even if the statute were unconstitutional or the action of the administrator unauthorized, they would not be entitled to the injunction which they ask, for the reason that no legal right of theirs is infringed by any proposed action of the county or of the commissioner of public works. The county, in its proposed action, will not infringe any such right; for it is thoroughly settled that competition by a county or municipality violates no right of a public service corporation doing business therein which, as is the case of plaintiffs here, has no exclusive franchise. Puget Sound Co. v. Seattle, 291 U.S. 619, 54 S.Ct. 542, 78 L.Ed. 1025; Madera Waterworks v. Madera, 228 U.S. 454, 33 S.Ct. 571, 57 L.Ed. 915. The administrator will not infringe any such right in making the loan and grant to the county from funds of the United States; for it is equally well settled that no citizen or taxpayer has any such right in funds of the government. Frothingham v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 601, 67 L.Ed. 1078. In the case just cited the Supreme Court, after referring to taxpayers' suits to enjoin an illegal use of money by a municipal corporation, said: "But the relation of a taxpayer of the United States to the federal government is very different. His interest in the moneys of the treasury—partly realized from taxation and partly from other sources—is shared with millions of others, is comparatively minute and indeterminable, and the effect upon future taxation, of any payment out of the funds, so remote, fluctuating and uncertain, that no basis is afforded for an appeal to the preventive powers of a court of equity."

As the county infringes no right of plaintiffs by entering into competition with them, and as the administrator infringes no right of theirs in making loans or grants of public funds, it would seem to follow necessarily that no such right is infringed when the administrator makes a loan and grant to the county in order that the county may engage in competition; for the addition of negative quantities can never result in a quantity that is positive. The exact question was before the Circuit Court of Appeals of the Eighth Circuit in Arkansas-Missouri Power Co. v. City of Kennett, Mo. (C.C.A.8th) 78 F.(2d) 911, 914, and we see no answer to what was said

by Judge Sanborn, speaking for the court, in that case. Said he:

"The court below was of the opinion that the power company was in no position to question the power of the federal government to loan or give money to the city of Kennett. We are in accord. The United States is not proposing to become a competitor of the power company. It will have no right, title, or interest in the plant when completed and nothing to do with operating it. The destruction of the power company's property will come about by reason of the city's operation of the plant when erected. The position of the United States is that of a lender of money, a buyer of bonds, and a giver of gifts. True, the money procured from the government will enable the city to build the plant, and, if the city builds the plant, it will no doubt operate it, and when it does operate the plant the city will take the customers of the power company, and the company's property in Kennett will become worthless or greatly impaired in value. We know of no rule of law, however, which permits one indirectly hurt, no matter how seriously, by a government expenditure, to question the power of the government to make it. In fact, the rule is to the contrary. Commonwealth of Massachusetts v. Mellon, Secretary of the Treasury et al., 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078; City of Allegan, Mich., v. Consumers' Power Co. (C.C.A.6) 71 F.(2d) 477 (certiorari denied 293 U.S. 586, 55 S.Ct. 100, 79 L.Ed. 681). It is true that in the cases cited the plaintiffs relied upon their status as taxpayers exclusively, while in this case the plaintiff relies, in addition, upon the injury which will be done to its property by municipal competition. That injury, however, is, so far as the government is concerned, clearly consequential and indirect, as we have pointed out. See, also, Missouri Utilities Co. v. City of California, Mo., et al. (D.C., W.D.Mo.) 8 F.Supp. 454, 465."

Another case directly in point is the case of City of Allegan v. Consumers' Power Co, (C.C.A.6th) 71 F.(2d) 477, 481 (certiorari denied 293 U.S. 586, 55 S.Ct. 100, 79 L.Ed. 681), referred to by Judge Sanborn in the above quotation. That case, just as the case at bar, involved a grant and loan by the administrator to a municipal corporation to construct an electric lighting plant which would compete with a private power company. The question of the constitutionality of title 2 of the National Recovery Act (40 U.S.C.A. § 401 et seq.) was raised there as it is here; and the Circuit Court of Appeals of the Sixth Circuit held that the company was "without right to raise any question either as to the effect of or the constitutionality of the Recovery Act" in that suit. It is true that the injury which might result from municipal competition was not discussed in the opinion; but as pointed out above this would have added nothing to plaintiff's position, for the city had a right to engage in such competition and invasion of rights cannot be predicated of competition which is rightful.

The precise question as to whether one who will be injured by the competition of another has a standing in court to protest the action of an officer of the government, alleged to be unlawful, which will enable such other to compete with him, was raised in United States v. Dern, 63 App.D.C. 28, 68 F.(2d) 773. That was a suit for mandamus to compel the Secretary of War to cancel certain leases of warehouses which were alleged to have been made contrary to law. Plaintiffs alleged that they were engaged in direct competition with the lessee, and that by reason of the advantageous provisions of the allegedly illegal lease agreements, the lessee was able to underbid them in competing for business. It was held, however, that this gave plaintiffs no right to challenge the legality of the action of the Secretary of War in making the leases.

Another decision very much in point is New Orleans M. & T. R. Co. v. Ellerman, 105 U.S. 166, 174, 26 L.Ed. 1015, wherein it was held that a right to question as ultra vires the acts of a railroad corporation did not arise because, as a result of these acts, competition for the business of complainant was created. The court said, "The only injury of which he can be heard in a judicial tribunal to complain is the invasion of some legal or equitable right. If he asserts that the competition of the railroad company damages him, the answer is, that it does not abridge or impair any such right. If he alleges that the railroad company is acting beyond the warrant of the law, the answer is, that a violation of its charter does not of itself injuriously affect any of his rights." Applying this language to the case at bar, the only injury of which plaintiffs can be heard in a judicial tribunal to complain is the invasion of some

legal or equitable right. If they assert that the competition of the county will damage them, the answer is that it will not abridge or impair any such right. If they allege that the administrator, in making the loan and grant, is acting beyond the warrant of the law, the answer is that such action does not of itself injuriously affect any of their rights.

The two cases upon which plaintiffs particularly rely with respect to their right to sue are Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070, 39 A.L.R. 468, and Frost v. Corporation Commission, 278 U.S. 515, 49 S.Ct. 235, 237, 73 L.Ed. 483; but what has already been said is sufficient to distinguish both of these. In the Pierce Case, a state statute, by requiring parents to send their children to public schools, threatened the destruction of the business of a private school by reason of the unlawful coercion exercised on its patrons. The injury threatened was, not from lawful competition, but from unlawful coercion of patrons; and this was what was enjoined. Here the only injury to plaintiffs that can arise is from the competition of the county, which is lawful. In the Frost Case, the plaintiff was the holder of a license to operate a cotton gin which the court held to be exclusive as against persons not similarly licensed. The Legislature attempted to grant a privilege to co-operative societies which was held void because violative of the equal protection clause of the Fourteenth Amendment. It was held that the plaintiff was entitled to enjoin one who attempted to operate in competition with him under a void permit issued under the unconstitutional statute. The court said that the holder of a valid license might "resort to a court of equity to restrain the illegal operation upon the ground that such operation is an injurious invasion of his property rights." Here the operation of a power plant by the county is not illegal, and plaintiff has no right to exclude the county from any competition upon which it may see fit to enter.

To conclude, we think: (1) That the loan and grant which the administrator of public works proposes to make to Greenwood county cannot be condemned either on the ground that the act of Congress under which they will be made is unconstitutional or that the administrator in making them will exceed his powers under the act; and (2) that, even if this were not true, no right of plaintiffs would be invaded either by the county in the building of the power project or by the administrator in the making of the loan and grant. In a similar case, the Circuit Court of Appeals of the Tenth Circuit, in Kansas Gas & Electric Co. v. City of Independence (C.C.A.10th) 79 F.(2d) 32, 100 A.L.R. 1479, denied relief on the first of these grounds; the Circuit Court of Appeals of the Sixth and Eighth Circuits in City of Allegan v. Consumers' Power Co. (C.C.A.6th) 71 F.(2d) 477, and Arkansas-Missouri Power Co. v. City of Kennett (C.C.A.8th) 78 F.(2d) 911, 914, 924, denied relief on the second ground.

The question arises whether there should be a dismissal on the merits or for lack of jurisdiction. While the second ground above mentioned is frequently treated as going to the question of jurisdiction, it really goes to the right of plaintiff to relief rather than to the jurisdiction of the court to afford relief in a proper case. In addition to this, the pleadings ask relief, which as we have seen was properly denied, on grounds other than the unconstitutionality of the statute and lack of authority in the administrator; and, as there was diversity of citizenship, the court had jurisdiction to pass on these matters. We think, therefore, that the decree appealed from should be reversed and that the lower court should be directed to dismiss the bill for lack of equity.

Reversed.

SOPER, Circuit Judge (dissenting).

When the federal emergency administrator of public works in the exercise of his authority under the statute decided to make the loan and grant to Greenwood county, S. C., to be used in the construction of a hydro-electric plant on the Saluda river, he intended not merely to effectuate the purpose of title 2 of the act to increase employment quickly, but also to reduce the cost of electric energy to the local community. The evidence shows quite clearly that he held the opinion that public utility companies have charged exorbitant prices, and that in particular the Duke Power Company and its subsidiary have exacted unreasonable rates, and that in order to bring down the rates for the benefit of the consumers it was desirable and proper that a part of the funds within his control should be used to establish municipal power projects in competition with privately owned public utilities.

When his authorized publications are considered, it is difficult to reach any other

conclusion. Thus in a press release of the Federal Emergency Administration of Public Works (PWA) of September 24, 1934, he said:

"PWA has endeavored to make electric energy more broadly available at cheaper rates by acting on applications of municipalities for loans and grants to finance municipal systems where reasonable security is offered and the project is socially desirable. They are deemed desirable where the loan can be amortized in a reasonable period while charging rates substantially lower than those of the existing utility.

"However, we make it a practice before approving the loan to give the company an opportunity to put in effect rates at least as low as those at which the municipal system will be self-liquidating. Several utility companies have accepted this opportunity. It is obvious that in such cases it is advantageous to the city and to PWA that the offer be accepted and the applications withdrawn. To make loans and grants to finance projects where the competitor offers rates which are lower than those possible by the city plant, would duplicate facilities without any social betterment and impose on the city a burden which it probably could not meet without resort to taxation.

"Furthermore, in the described situation Public Works will be free to use its funds to better advantage elsewhere. The action of the utility companies referred to supports the belief that domestic rates, in certain instances at least, are so high as to be disadvantageous to the company as well as unjust to the consumers. Experience shows that lower rates may produce larger profits particularly where promotional campaigns are conducted and the cost of electrical appliances is made reasonable.

"PWA will cooperate with cities to prevent rates rising on an indication municipal plants may not be built. PWA will not rescind allotments or suggest the withdrawal of applications until the lowered rates are legally in effect.

"State laws authorize municipal competition, hence it is PWA's position that the state has determined that such competition may be socially desirable. We believe it is for the municipal applicant to determine whether or not it desires to compete with privately owned utilities. It is our policy to consider such applications particularly where franchises are soon to expire, provided the project is self-liquidating at rates lower than those which the existing utility is willing to put into effect."

In his testimony given in the pending case on December 21, 1935, the administrator did not repudiate this statement but said that it was not a true statement standing alone and must be understood as corrected by his testimony. A more detailed expression of his purposes as administrator and his views upon the practices of public utility companies in general and of the Duke Power Company in particular is found in his story of PWA told in his book "Back to Work," May 16, 1935, chapter 6, Cheap Power, pp. 122 to 147, wherein reference to the Greenwood county project is made. He shows how the great federal power projects, such as Boulder Dam on the Colorado river, are the beginnings of a national plan designed to increase the supply of electric power and diminish its cost, and thus to put it within the reach of the under-privileged for many uses and raise the standard of living in their homes. With respect to municipal power projects established under PWA he has this to say (p. 147):

"By January of 1935, twelve municipal power projects had been completed. Forty-eight others were under construction; thirty-four more had been approved by the power board, and about seventy-one were under consideration. The total amount allotted at that time for this purpose was $48,784,300.

"One of the most important accomplishments of PWA, although an indirect one, has been a saving to consumers of millions of dollars through the lowering of rates by the private utilities to meet the charges proposed by applicants for public power projects. The rejection or withdrawal of some of the 200 applications that PWA did not approve was the result of this reduction of rates by the private companies to a point where there seemed no necessity or justification for a municipal plant.

"These 'yardsticks' provided by both municipal and federal enterprises are so valuable that they alone would warrant PWA's expenditures for power undertakings. The municipal projects have caused private utilities to adjust their rates downward in wide areas and the federal projects have brought about rate adjustments over still larger expanses of territory."

How are these formal statements modified by his present testimony? To the extent that the government is interested in

the rates to be charged by the county only as a prospective bondholder and does not intend to exercise any control over them. He adds that the loan and grant would have been made regardless of the rates of the Duke Power Company, if it had been established that the county had legal authority to make the contract and that the loan would be liquidated; but as this statement enters the realm of conjecture it adds little to the discussion.

One is presumed to intend the natural and probable consequences of his acts; and the public utterances of the administrator show that he realized that his loans and grants to municipal power projects would reduce local utility rates, and that he made them for this purpose. The reduction of rates under the plan of PWA in this case is not merely probable, it is inevitable. The municipality not only makes no investment, but it assumes no liability for the loan of 70 per cent., for that is to be represented by revenue bonds payable only out of income of the plant. In addition, 30 per cent. of the cost of the project is a free gift. The power company, therefore, is not obliged to meet merely the influence of a competitor who risks his own money in the enterprise. Competition of that sort must be endured without complaint. The fact is that the county is freely furnished with sufficient funds to build the entire plant and thus may cut the rates with impunity; so that a reduction of rates in order to get the business and satisfy the demands of its citizens will certainly ensue.

We may lay to one side the protests of the power company that the state authorities have found the rates of its intrastate industry to be fair and reasonable, and the accusations of the administrator that the rates are exorbitant. The question is, Has the federal government the constitutional right to exert this regulatory power in a local field on the ground that it is only an incidental result of the laudable effort under the general welfare clause of the Constitution to put an end to unemployment? The conflict between state and federal power which arises is similar to that which the Supreme Court resolved on January 6, 1936 in U. S. v. Butler when it held that a statutory plan to regulate and control agricultural production effected by contracts between the farmers and the government was beyond its power and invaded the reserved rights of the states. The principle underlying that decision seems to control this case, and the factual differences between them do not appear to be material. The PWA contract does not in terms obligate the municipality to reduce the rates as directly as the farmers in their agreements were required to curtail production, but the rates are bound to be reduced as a result of that contract, as we have seen. Moreover the coercion imposed upon the power company with reference to its charges bears some analogy to the virtual compulsion under which the farmers' contracts were signed. The party to the present contract with the government is a municipality or agency of the state which consents to the invasion of the state's domain, and not a private citizen; but the state no more than the individual may be induced by gift to break down the barriers which confine the federal government within constitutional limits. In U. S. v. Butler the court said:

"But it is said that there is a wide difference in another respect, between compulsory regulation of the local affairs of a state's citizens and the mere making of a contract relating to their conduct; that, if any state objects, it may declare the contract void and thus prevent those under the state's jurisdiction from complying with its terms. The argument is plainly fallacious. The United States can make the contract only if the federal power to tax and to appropriate reaches the subject-matter of the contract. If this does reach the subject-matter, its exertion cannot be displaced by state action. To say otherwise is to deny the supremacy of the laws of the United States; to make them subordinate to those of a state. This would reverse the cardinal principle embodied in the Constitution and substitute one which declares that Congress may only effectively legislate as to matters within federal competence when the states do not dissent."

The conclusion is that title 2 of the statute is invalid so far as it may be interpreted to authorize the making of such a contract as we have here; and that the effort of the administrator to regulate the local intrastate business of the power company is beyond the scope of the power which may be conferred by Congress upon an officer of the federal government.

The power company has such an interest in the business as to justify its suit. The practical effect upon its valuable property interests is manifest. It has an interest far more weighty than that of a federal taxpayer, which in Frothingham v. Mellon, 262

1002

U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078, was held to be too remote, uncertain, and insig-nificant to entitle him to injunctive relief against an invalid federal appropriation. The plaintiffs here conform to the rule laid down in that case since they show not only that the act of the administrator was invalid, but that they are in danger of sustaining a direct and substantial injury therefrom.